UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | |
| MEBRAHTU TSEHAY | ) | Case No. 17-32653 |
| | ) | |
| Debtor. | ) | Hon. Deborah L. Thorne |
| _____ | ) | |
| | ) | |
| | ) | |
| MEDALLION FINANCIAL CORP., | ) | |
| | ) | Adv. No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEBRAHTU TSEHAY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT TO REVOKE ORDERS CONFIRMING PLAN

## AND GRANTING THE DEBTOR'S DISCHARGE

NOW COMES the Plaintiff, MEDALLION FINANCIAL CORP. ("Medallion Financial"), by and through its undersigned counsel, and brings this adversary proceeding against MEBRAHTU TSEHAY (the "Debtor"), and states as follows:

## Introduction

1.    By this proceeding, Medallion Financial seeks (a) to revoke the confirmation of the Debtor's Modified Chapter 13 Plan under 11 U.S.C. § 1330 and (b) to revoke the discharge granted to the Debtor under 11 U.S.C. § 1328(e), both due to the Debtor's fraudulent misrepresentations that the Debtor owned certain taxi medallions issued by the City of Chicago. Those taxi medallions, which the Debtor represents comprise almost seventy percent (70%) of

1

the total asset values listed in the Debtor's bankruptcy filings, were owned by separate corporations that have not filed bankruptcy.  In obtaining relief based on those fraudulent representations, the Debtor utilized the principal assets of the two corporations to materially reduce the Debtor's personal liabilities in obtaining a discharge.  All relief granted to the Debtor based upon such fraudulent representations must be revoked.

## Parties, Jurisdiction and Venue

2.      The Plaintiff, Medallion Financial Corp., is a Delaware corporation with a usual place of business at 437 Madison Ave., 38th Floor, New York, New York.

3.      The Defendant, Mebrahtu Tsehay, is an individual who currently resides at 15 N Delphia Ave., Park Ridge, Illinois.

4.      The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b).

5.      The matter before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I).

6.      This adversary proceeding has been brought in the proper venue pursuant to 28 U.S.C. § 1409(a).

7.      Medallion Financial consents to the entry of final orders of judgment by the bankruptcy court pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

## Facts Common to All Counts

8.      Medallion Financial entered into prepetition loan arrangements with two corporations wholly owned by the Debtor, being Tahoora Transportation Inc. ("Tahoora") and Shere Corp. ("Shere").  The Debtor executed the subject loan documents as the president of each of the corporations and also signed separate personal guaranties with respect to the indebtedness of the corporations to Medallion Financial.  The Tahoora loan arrangement was secured by,

among other things, Chicago Taxicab License Medallion Number 1226TX ("Medallion No. 1226"), and the Shere loan arrangement was secured by, among other things, City of Chicago Taxicab License Medallion Number 4307TX ("Medallion No. 4307").  In each instance, the Debtor represented that the medallions were owned by the respective corporations and provided copies of the medallion licenses from the City of Chicago's Department of Business Affairs and Consumer Protection that were clearly issued to the corporations.  The Debtor's bankruptcy filings, in clear contrast to the truth, all represent that the Debtor personally owned the medallions.

The Tahoora Transportation Inc. Loan Arrangement

9.      On or around July 24, 2013, Tahoora executed and delivered to Medallion Financial a Promissory Note in the principal amount of $240,000.00 (as may have been modified and currently in effect, the "Tahoora Note").  A true and correct copy of the Tahoora Note is attached hereto as "**Exhibit 1**" and is incorporated herein by reference.  The Tahoora Note was executed by the Debtor in his capacity as President of Tahoora.

10.      Also on or around July 24, 2013, and to secure the indebtedness under the Tahoora Note, Tahoora and Medallion Financial entered into that certain Security Agreement (the "Tahoora Security Agreement") whereby, among other things, Tahoora granted Medallion Financial a continuing security interest and lien in Tahoora's primary asset, being Medallion No. 1226.  A true and correct copy of the Tahoora Security Agreement is attached hereto as "**Exhibit 2**" and is incorporated herein by reference.  The Tahoora Security Agreement was executed by the Debtor in his capacity as President of Tahoora and states that Tahoora is the owner of Medallion No. 1226.

11.     Also on or around July 24, 2013, the Debtor executed that certain Guaranty (the "<u>Tahoora Guaranty</u>") whereby the Debtor, as primary obligor and not merely as a surety, irrevocably and unconditionally guaranteed to Medallion Financial payment when due, whether by acceleration or otherwise, of any and all liabilities of Tahoora to Medallion Financial, together with all interest thereon and all attorneys' fees, costs and expenses of collection incurred in enforcing such liabilities.  A true and correct copy of the Tahoora Guaranty is attached hereto as "**Exhibit 3**" and is incorporated herein by reference.

<u>The Shere Corp. Loan Arrangement</u>

12.     On or around July 24, 2013, Shere executed and delivered to Medallion Financial a Promissory Note in the principal amount of $240,000.00 (as may have been modified and currently in effect, the "<u>Shere Note</u>").  A true and correct copy of the Shere Note is attached hereto as "**Exhibit 4**" and is incorporated herein by reference.  The Shere Note was executed by the Debtor in his capacity as President of Shere.

13.     Also on or around July 24, 2013, and to secure the indebtedness under the Shere Note, Shere and Medallion Financial entered into that certain Security Agreement (the "<u>Shere Security Agreement</u>") whereby, among other things, Shere granted Medallion Financial a continuing security interest and lien in its primary asset, being Medallion No. 4307.  A true and correct copy of the Shere Security Agreement is attached hereto as "**Exhibit 5**" and is incorporated herein by reference.  The Shere Security Agreement was executed by the Debtor in his capacity as President of Shere and states that Shere is the owner of Medallion No. 4307.

14.     Also on or around July 24, 2013, the Debtor executed that certain Guaranty (the "<u>Shere Guaranty</u>") whereby the Debtor, as primary obligor and not merely as a surety, irrevocably and unconditionally guaranteed to Medallion Financial payment when due, whether

4

by acceleration or otherwise, of any and all liabilities of Shere to Medallion Financial, together with all interest thereon and all attorneys' fees, costs and expenses of collection incurred in enforcing such liabilities.  A true and correct copy of the Shere Guaranty is attached hereto as "**Exhibit 6**" and is incorporated herein by reference.

<u>The Debtor's Fraudulent Representations in His Bankruptcy Filings</u>

15.     The Debtor filed his voluntary petition (the "<u>Petition</u>") for relief under Chapter 13 of the Bankruptcy Code on October 31, 2017.

16.     The Petition and related schedules list among other things:  (a) the Debtor's ownership of Medallion No. 1226 and Medallion No. 4307 (*See* Petition, Part 4, § 27); and (b) the Debtor's one hundred percent (100%) ownership interests in each of Tahoora and Shere. (*See* Petition, Schedule A/B, Part 5, § 42).

17.     The Debtor, however, has never owned Medallion No. 1226 or Medallion No. 4307, which taxi medallions have been owned by the respective corporate entities at all relevant times.

18.     In applying for its loan arrangements with Medallion Financial, Tahoora Transportation, by and through the Debtor, provided Medallion Financial with a copy of Medallion No. 1226 issued by the City of Chicago's Department of Business Affairs and Consumer Protection.  A copy of Medallion No. 1226 is attached hereto as "**Exhibit 7**" and is incorporated herein by reference, and is clear that it was issued to and owned by Tahoora, not the Debtor.

19.      In applying for its loan arrangements with Medallion Financial, Shere, by and through the Debtor, provided Medallion Financial with a copy of Medallion No. 4307 issued by the City of Chicago's Department of Business Affairs and Consumer Protection.  A copy of

Medallion No. 4307 is attached hereto as "**Exhibit 8**" and is incorporated herein by reference, and is clear that it was issued to and owned by Shere, not the Debtor.

20.     The Debtor has always known that the corporate entities, and not the Debtor personally, owned the respective medallions.

21.     Nonetheless, the Debtor intentionally and fraudulently represented to the Court that the Debtor personally owned the respective medallions.

22.     The purported value of the medallions according to the Debtor's bankruptcy filings, being a combined $460,000, comprise almost seventy percent (70%) of the total asset values listed in the Debtor's bankruptcy filings.

Confirmation of The Debtor's Plan and Discharge Order

23.     The Debtor filed his Modified Chapter 13 Plan on February 6, 2018 (the "Plan") which, in pertinent part, provided that "Debtor is surrendering Taxi Medallion #1226 and Taxi Medallion #4307 to Medallion Financial Corp/Medallion Bank in full satisfaction of its secured claims." A true and correct copy of the Plan is attached hereto as "**Exhibit 9**" and is incorporated herein by reference.

24.     Based upon the Debtor's representations to the Court, including that he personally owned the subject taxi medallions, the Plan was confirmed pursuant to the Order Confirming Plan entered by the Court on March 7, 2018.

25.     Based upon the Debtor's representations to the Court, including that he personally owned the subject taxi medallions, a discharge for the Debtor was also granted pursuant to Order entered by the Court on July 16, 2018.

**Count I**
**(For Revocation of the Debtor's Plan Pursuant to 11 U.S.C. §1330)**

6

26.     Medallion Financial restates and incorporates Paragraphs 1 through 25 as though fully stated herein.

27.     At all relevant times, the Debtor knew or had reason to know that he did not own Medallion No. 1226.

28.     At all relevant times, the Debtor knew that Medallion No. 1226 was owned by Tahoora.

29.     At all relevant times, the Debtor knew or had reason to know that he did not own Medallion No. 4307.

30.     At all relevant times, the Debtor knew that Medallion No. 4307 was owned by Shere.

31.     The Debtor deliberately and fraudulently represented to the Court in his bankruptcy schedules and other filings that he owned Medallion No. 1226 and Medallion No. 4307.

32.     The Order Confirming Plan was procured through the Debtor's fraudulent representations that the Debtor owned the subject medallions.

WHEREFORE, the Plaintiff, Medallion Financial Corp., requests the following relief:

(A)     That the Court, adjudge, determine, and decree that the Order Confirming Plan entered in the above-captioned Chapter 13 bankruptcy case on March 7, 2018 was procured by fraud;

(B)     That the Order Confirming Plan entered in the above-captioned Chapter 13 bankruptcy case on March 7, 2018 be revoked pursuant to 11 U.S.C. § 1330;

(C)     That the plaintiff, Medallion Financial Corp., be awarded its attorneys' fees and costs in this adversary proceeding; and

(D)    For such other and further relief as the Court may determine to be just and proper.

**Count II**
**(For Revocation of the Discharge Order Pursuant to 11 U.S.C. §1328(e))**

33.    Medallion Financial restates and incorporates Paragraphs 1 through 25 as though fully stated herein.

34.    At all relevant times, the Debtor knew or had reason to know that he did not own Medallion No. 1226.

35.    At all relevant times, the Debtor knew that Medallion No. 1226 was owned by Tahoora.

36.    At all relevant times, the Debtor knew or had reason to know that he did not own Medallion No. 4307.

37.    At all relevant times, the Debtor knew that Medallion No. 4307 was owned by Shere.

38.    The Debtor deliberately and fraudulently represented to the Court in his bankruptcy schedules and other filings that he owned Medallion No. 1226 and Medallion No. 4307.

39.    The Order discharging the Debtor was procured through the Debtor's fraudulent representations that the Debtor owned the subject medallions.

40.    Medallion Financial does not have any records of notice received relating to the Debtor's bankruptcy case.  Medallion Financial first learned of the Debtor's bankruptcy filing, and the Debtor's fraudulent representations made to procure confirmation of the Plan and the discharge, when it engaged counsel relating to the subject loans on or around August 24, 2018.

WHEREFORE, the Plaintiff, Medallion Financial Corp., requests the following relief:

(A)    That the Court, adjudge, determine, and decree that the discharge of the Debtor entered in the above-captioned Chapter 13 bankruptcy case on July 16, 2018 was procured by fraud;

(B)    That the discharge of the Debtor entered in the above-captioned Chapter 13 bankruptcy case on July 16, 2018 be revoked pursuant to 11 U.S.C. § 1328(e);

(C)    That the plaintiff, Medallion Financial Corp., be awarded its attorneys' fees and costs in this adversary proceeding; and

(D)    For such other and further relief as the Court may determine to be just and proper.

Dated: August 31, 2018                    Respectfully submitted,
      Chicago, Illinois

                                   **MEDALLION FINANCIAL CORP.**

                                   By:    */s/  Phillip J. Block*
                                         One of Its Attorneys

Phillip J. Block (ARDC # 6292407)
Riemer & Braunstein LLP
71 South Wacker Drive, Suite 3515
Chicago, IL 60606
Telephone:  (312) 780-1173
Facsimile:   (312) 780-1212
pblock@riemerlaw.com

2363667.1

# EXHIBIT 1

**Medallion Financial Corp.**

## PROMISSORY NOTE

**Medallion # 1226TX**
**July 24, 2013**

$240,000.00

FOR VALUE RECEIVED, the undersigned, **Tahoora Transportation Inc.**, (the "Borrower"), located at **4626 W. Cornelia Avenue, Chicago, IL 60641**, promises to pay to the order of **Medallion Financial Corp.** (the "Lender"), in lawful money of the United States, at 111 W. Washington Street, Suite 1270, Chicago, Illinois 60602, or at such other place as may be designated in writing by the holder of this Note, the principal sum of **Two Hundred Forty Thousand Dollars ($240,000.00)**, with interest thereon to be computed and paid from the date of this Note until **July 24, 2018** (the "Maturity Date"), at the rate of **five and 25/100 percent (5.25%)** per annum except as set forth below, in constant monthly installments of **$1,545.40**, commencing on **August 24, 2013**, and on the 24th day of each month thereafter until the Maturity Date, at which time all unpaid principal balance and accrued interest shall be due and payable. All payments, including but not limited to, monthly installment payments, shall be applied first to any outstanding charges, fees, costs or expenses incurred, then to accrued interest, and then to the outstanding principal.

If the execution of this note and the disbursement of funds there from do not occur simultaneously, then Lender may elect, in its sole untrammeled discretion, to extend: (1) the initial date upon which interest begins to accrue, or (2) the date upon which the loan ultimately matures, or both. But such extension will in no event exceed the number of days which elapsed between execution and initial disbursement of the loan proceeds or any portion thereof.

Notwithstanding the foregoing, if (i) there shall occur an "Event of Default" under the Security Agreement described below (as such term is defined in the Security Agreement) or (ii) the Maturity Date shall occur, or (iii) any sum shall not be paid when it is due hereunder, then from and after any such occurrence or nonpayment the undersigned shall pay interest to the Lender, on demand, on the entire principal amount then outstanding hereunder and/or under the Security Agreement at the highest rate permitted by law.

Interest shall be computed on the basis of a **360-day year for the actual** number of days elapsed. Under no circumstances shall the undersigned be charged more than the highest rate of interest which lawfully may be charged by the holder hereof and paid by the undersigned on the indebtedness evidenced hereby.

It is, therefore, agreed that if at any time interest on the indebtedness evidenced hereby would otherwise exceed the highest lawful rate, only such highest lawful rate will be paid by the undersigned. Should any amount be paid by the undersigned in excess of such highest lawful amount, such excess shall be deemed to have been paid in reduction of the principal balance thereof.

In the event that any payment due hereunder shall not be received by the Lender within ten (10) days of the date when such payment is due and payable, a late charge of five cents ($0.05) for each dollar ($1.00) so overdue may be charged by the Lender.

This Note is a promissory note and is secured by a Security Agreement of even date herewith between the undersigned and the Lender (the "Security Agreement") affecting property more particularly described therein, and all of the covenants, conditions and agreements contained in the Security Agreement are by this reference incorporated herein and made a part hereof. At the option of the holder of this Note and upon the terms and conditions provided in the Security Agreement, upon (a) a default in making any payment of principal and interest hereunder when due and payable, and such default continuing beyond the applicable grace period, if any, or (b) the occurrence of an Event of Default (as such term is defined in the Security Agreement), the unpaid principal balance hereof and all accrued interest shall become immediately due and payable. In enforcing its rights under this Note and under such Security Agreement and other instruments delivered in connection with the loan represented hereby, the holder shall have the right and option to pursue its remedies with respect to this Note or to enforce the provisions of the Security Agreement or such other instruments, or any combination thereof, and either simultaneously or in such order as the holder shall deem in its best interest.

The undersigned, and all persons liable or to become liable on this Note, agree, jointly and severally, to pay all costs of collection, including reasonable attorneys' fees and disbursements, in case the unpaid principal balance of this Note, or any payment of principal and/or interest thereon, is not paid when due, or in case it becomes necessary to protect the security for the indebtedness evidenced hereby, whether suit be brought or not.

This Note may be prepaid in whole or in part at any time, provided that (i) the undersigned give the Lender written notice of the prepayment at least thirty (30) days but not more than forty-five (45) days prior to such prepayment, which notice shall expressly set forth the date such prepayment is to be made (the "Noticed Prepayment Date"); (ii) all accrued interest has been paid to the date of such prepayment; (iii) the undersigned pay to the Lender a prepayment fee equal to an additional ninety (90 days) days' interest at the rate herein set forth on the amount of the principal being repaid; and (iv) if the prepayment is not made on the Noticed Prepayment Date, the undersigned shall provide the Lender with an additional thirty (30) days' prior written notice and designate a new Noticed Prepayment Date. This fee shall not apply if the loan is pre-paid after the 1st 12 months of the original or modified loan term. If this Note is prepaid in part, then any such payments shall be applied against the payments due hereunder in inverse order of maturity.

If the due date of any required payment under this Note is not a "business day" (for this purpose, any day other than a Saturday, Sunday or legal holiday observed in the State of New York), such required payment shall be due and payable on the immediately succeeding business day.

Notwithstanding any and all prepayment and other applicable penalties sent forth herein and in the other documents relating to this loan, if during the term of this Loan, and for a period of ninety (90) days thereafter, the borrower receives a solicited or unsolicited bona fide offer from a third party to provide Borrower with funds for the purpose of the repayment, in whole or in part, of this Loan, and Borrower wishes to accept such replacement financing, Borrower shall first provide to Lender the actual written evidence of such financing terms being offered by the third party. Lender shall have ten (10) business days from the receipt thereof to exercise the right "but not the obligation" to provide such financing to the Borrower at the terms set forth in the third party term sheet (which shall not be inclusive of any and all prepayment or other penalties set forth herein and in the other documents relating to this Loan that Borrower will remain fully responsible for), and Borrower shall enter into a Loan modification agreement with Lender setting forth such new loan terms. If Lender fails to so elect within ten (10) business days, Borrower shall be permitted to accept the third party offer and repay all or part of the loan, in which case any and all prepayment and other applicable penalties shall be applied.

At any time during the term of this loan, Lender may require the Borrower to establish an automatic payment account, i.e., Electronic Funds Transfer, for the purpose of making loan payments in lieu of a voucher or check writing system. Within five (5) days of Lender giving the Borrower notice of such requirement, Borrower shall immediately furnish all information and authorizations that Lender requires to establish such automatic debit collection system, including but not limited to any and all checking accounts, bank accounts, and authorization required by the financial institution selected to establish such automatic payment and debit system. Borrower agrees that in the event Lender establishes such automatic payment account, Borrower will maintain a sufficient balance in such account to ensure that funds are available for making the loan payments to Lender on the respective due dates of such payments. The automatic debit will take place five (5) days after the stated due date. In the event that an automatic debit is returned by the Borrower's bank for any reason whatsoever, the account will be charged a $50.00 fee. The failure of Borrower to establish such automatic account and/or to furnish any other item requested by Lender for the purpose of establishing such account, and/or the failure of the Borrower to maintain a sufficient amount of funds in such account to insure that sufficient funds are available in such account to pay the loan payments as they become due, shall constitute an event of default by borrower under this Loan Agreement, the Promissory Note, and Security Agreement of even date giving Lender any and all such rights as the Lender may have in the event of a borrower's default.

Any payment of the principal balance of this Note after the Lender shall have declared the unpaid principal balance hereof and all accrued interest immediately due and payable in accordance with the provisions of this Note or the Security Agreement shall be deemed to be a voluntary prepayment for all purposes hereof, and a prepayment fee calculated pursuant to the provisions of the immediately preceding paragraph shall be payable with respect thereto.

This Note shall be governed by and interpreted in accordance with the laws of the State of Illinois.

**Tahoora Transportation Inc.**

By _____
Mebrahtu T. Tsehay - President and Secretary

STATE OF ILLINOIS)
         : ss.:
COUNTY OF COOK )

On the **24th** day of **July, 2013**, before me personally came **Mebrahtu T. Tsehay**, to me known, who, being by me duly sworn, did depose and say that he/she resides at **15 N. Delphia Avenue, Park Ridge, IL 60683**; that he/she is the **President and Secretary** of **Tahoora Transportation Inc.**, the corporations described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by order of the board of directors of said corporations.

_____
Notary Public

OFFICIAL SEAL
RITA RIVERA
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 08/28/2015

# EXHIBIT 2

## SECURITY AGREEMENT

Medallion # **1226TX**

AGREEMENT, made <u>July 24, 2013</u>, by and between <u>Tahoora Transportation Inc.</u>, having an address at <u>4626 W. Cornelia Avenue, Chicago, IL 60641</u> (the "Borrower"), and Medallion Financial Corp. having an office at 111 W. Washington, Suite 1270, Chicago, Illinois 60602 (the "Lender").

### W I T N E S S E T H :

WHEREAS the Borrower has requested that Lender make available the financial accommodations hereinafter set forth and in order to induce the Lender to make such accommodations wishes to assign to Lender the Collateral (as hereinafter defined);

WHEREAS the Lender is willing to extend such financial accommodations to the Borrower upon and subject to the terms and conditions set forth in this Agreement; and

WHEREAS the Borrower has executed and delivered to the Lender a note (the "Note") dated of even date herewith and payable to the order of the Lender in the principal sum of <u>Two Hundred Forty Thousand Dollars</u> ($240,000.00), which Note evidences a certain loan in such amount made by the Lender to the Borrower (the "Loan").

NOW THEREFORE, in condition of the mutual covenants herein contained and to secure the payment of the Indebtedness, it is hereby agreed as follows:

1.   The principal amount of the Loan shall be repaid by the Borrower in the manner described in the Note, with interest described therein.   The principal sum of the Note, together with all payments due hereunder or under the Note and all other sums that may be advanced by the Lender pursuant to the Note and any other indebtedness or liability of the Borrower to the Lender, direct or indirect, absolute or contingent due or to become due, now existing or hereafter arising, including all future advances or loans that may be made at the option of the Lender, together with any interest due and payable with respect to any of the foregoing until all such sums and the interest thereon are paid, are hereinafter collectively referred to as the "Indebtedness.".

2.   The term "Collateral" as used herein, shall refer, collectively, to the following property, whether now owned or hereafter acquired by the Borrower and whether or not purchased with proceeds of the Loan or with other sums advanced by the Lender:
    (a) All of the taxicab vehicles, City of Chicago taxicab licenses and representative medallions (including, without limitation, those vehicles, licenses and medallions described on Schedule A, annexed hereto), taxicab roof lights, taximeters and all other items of property owned by the Borrower or in which the Borrower has rights and used or useful in conjunction with the Borrower's operation of its business;

    (b) Any subscription right granted to the Borrower by the City of Chicago to purchase one or more additional taxicab licenses and representative medallions or any partial interest therein;

    (c)   All other personal property owned by the Borrower or in which the Borrower has rights, including, without limitation, all furniture, fixtures, equipment, machinery, inventories, contract rights, moneys, accounts, general intangibles, goods, instruments, documents and chattel paper (except, if the Borrower is a natural person, only to the extent that such personal property is related to or used or useful in conjunction with Borrower's business); and

    (d) All substitutions for, all additions to and all proceeds and products of all of the foregoing property described in subparagraphs (a), (b) and (c) of this Paragraph 2 in any form whatsoever (including, without limitation, all proceeds of insurance thereon).

3.   In order to secure (i) the full and timely payment of the Indebtedness and (ii) the performance and observance of the Borrower's obligations under this Agreement and the Note as such obligations now exist or may exist in the future, the Borrower hereby

    (a) Grants to the Lender a continuing security interest and lien in and to all of the Collateral.  The security interest and lien created hereby shall remain in full force and effect until the Indebtedness has been paid in full, at which time the security interest and lien created hereby shall cease and terminate and this Agreement shall be deemed terminated without further liability on the part of any party to the other;

    (b)     Assigns and absolutely transfers to Lender all the right, title and interest of Borrower in, to and under all leases/management agreements for the use of the medallions and other collateral described in attached Schedule "A" together with all the rents, royalties, issues, profits, income, security deposits, and other benefits at any time occurring with respect to the leases/management agreements (collectively, the "Rents") and all extensions, renewals, modifications or replacements of the leases, and together with any and all guarantees of the obligations of the managers/lessees of the leases/management agreements, whether now existing or as signed after the date of the assignment contained in this Security Agreement, and all extensions and renewals of the guarantees.
4.   The Borrower makes the following representations, covenants and warranties to the Lender (which representations, covenants and warranties shall survive the execution and delivery of this Agreement) and agrees with the Lender as follows:

    (a)  the Borrower shall pay the Indebtedness and shall perform all of the obligations of this Agreement in accordance with the

terms hereof;

(b) the Borrower is an active small business concern and the sole owner of record of, and has the entire beneficial interest in and good title to the Collateral, free and clear of all claims, pledges, liens encumbrances and security interests of every nature whatsoever (except for the security interest and lien created hereby for the benefit of the Lender and except for the security interests and liens, if any, described on Schedule B, annexed hereto, which security interests and liens are referred to collectively herein as the "Permitted Encumbrances");

(c) the Borrower has the full and unconditional right to grant to the Lender the security interest and lien granted herein; no terms or conditions of this Agreement are in violation of the provisions of any other agreement to which the Borrower is a party;

(d) all of the documents which comprise the Collateral are valid, binding and enforceable in accordance with their respective terms;

(e) the Borrower does and will forever warrant and defend the Lender's right, title, priority, lien and security interest in and on the Collateral against the claims and demands of all persons whosoever (except for Permitted Encumbrances);

(f) the Borrower and any guarantors have not been known by any other name during the last ten years;

(g) there is no action or proceeding pending, or to the knowledge of the Borrower, threatened, which in any way might materially and adversely affect (i) the rights of the Lender under this Agreement, (ii) the Borrower's or any guarantor's ability to perform its obligations hereunder, (iii) title to the Collateral, or (iv) the validity or priority of the security interest and lien in and on the Collateral created hereunder;

(h) there are no judgments against the Borrower unpaid or unsatisfied of record in any court of this state or of the United States; no bankruptcy proceedings have ever been instituted by or against the Borrower; and at no time has the Borrower made an assignment for the benefit of creditors;

(i) the Borrower shall not, without the Lender's prior written consent and in accordance with the conditions of any such consent and in full compliance with the terms hereof and all applicable laws, rules, regulations and orders; make or suffer (i) any sale, assignment or other transfer of, (ii) any further pledge or encumbrance of, or (iii) any further lien upon or security interest in, all or any part of the Collateral.

(j) the Borrower shall pay, when due, all taxes, assessments (including, without limitation, fines and penalties imposed or assessed by reason of the Borrower's operation of its taxicab vehicles, taxicab licenses and medallions) and license fees related to the Collateral and, if the Borrower is a corporation, to the operation of the corporation, and shall keep the Collateral free and clear of all liens, charges, taxes and assessments;

(k) the Borrower, without cost or expense to the Lender, shall execute, deliver, file and record such further agreements, instruments and documents as the Lender may require, including, without limitation, financing statements covering the Collateral and amendments to such financing statements, to impose, perfect, protect and continue the security interest and lien created and granted herein, and hereby irrevocably authorizes the Lender to execute, in the name of the Borrower, any such agreements, instruments and documents and to file and record the same so long as the same does not increase the Borrower's obligations or reduce its rights under this Agreement; and the Lender is authorized to file one or more financing statements covering the Collateral signed only by the Lender;

(l) the Borrower shall keep the Collateral at the Borrower's garage at the address set forth on the annexed Schedule A and shall not remove same (except in the usual course of business for temporary periods) without the prior written consent of the Lender;

(m) the Borrower, at its own cost and expense, shall keep the Collateral in good repair and condition and shall not misuse or waste the Collateral, or allow the Collateral to deteriorate except for normal wear and tear, and shall replace any taxicab vehicle that is unsafe or unfit for regular, continuous service, and shall make the Collateral available for inspection by the Lender at all reasonable times;

(n) the security interest created by this Agreement is security for the repayment of a loan or advance to be used solely for business purposes; to the extent that such loan or advance is to be used to pay all or part of the purchase price of the Collateral or any part thereof, the Borrower agrees to use the proceeds of the loan or advance to pay such purchase price;

(o) the Borrower shall maintain liability insurance, including excess coverage, for each of its taxicab vehicles in an amount not less than the minimum required pursuant to all applicable Chicago ordinances, all of which insurance shall be under policies and with insurers authorized and licensed to do business in the State of Illinois and acceptable to the Lender, and which policies shall provide for all losses to be paid to the Lender and for at least thirty (30) days' prior written notice to the Lender of any intended cancellation or modification thereof;

(p) the Borrower shall deliver to the Lender the policies and certificates of insurance with evidence of payment of the premiums thereon;

(q) the Borrower shall give immediate written notice to the Lender and to insurers of loss or damage to the Collateral and shall promptly file proof of loss with said insurers; the Borrower shall fully cooperate with its insurers in reporting, investigating, and prosecuting or defending, as the case may be, any claim by, on behalf of or against the Borrower arising out of the operation of its taxicab vehicles or otherwise in connection with its business; the Borrower hereby irrevocably authorizes the Lender to file claims, and the Lender shall have the sole right to adjust, settle and collect claims under said insurance in the name of the Borrower and the Lender

by such means, at such times and on such terms as the Lender may determine, and in the name and on behalf of the Borrower to execute releases and endorse checks or drafts payable in respect of any such insurance claims; and the Borrower hereby assigns to the Lender all sums that may become payable under such insurance, including return of premiums and dividends, as additional security for the Indebtedness;

(r)   the Borrower shall notify the Lender immediately in writing of any change in or discontinuance of the Borrower's place or places of business;

(s)   the Borrower shall notify the Lender immediately in writing of any events or circumstances that at any time may cause the representations and warranties herein to cease to be true;

(t)   the Borrower shall notify the Lender immediately in writing if it obtains any substitutions for or replacements of its taxicab vehicles, licenses and medallions, roof lights or taximeters, or any other part of the Collateral; all of which substitutions and replacements shall constitute collateral for all purposes hereunder;

(u)   the Lender, in any action to enforce, foreclose or protect the security interest and lien created and granted hereby, shall be entitled, without notice and without regard to the adequacy of any security held by the Lender for the Indebtedness, to the appointment of a receiver;

(v)   The Borrower (or, if the Borrower is a corporation, partnership or joint venture, each officer, general partner or member of the Borrower, as the case may be) has read and is familiar with the Rules, Requirements and Procedures Governing Owners of Medallions Taxicabs as promulgated by the City of Chicago Taxi and Department of Consumer Services (the "Rules"); and the Borrower shall comply with said Rules and with any and all other applicable terms, provisions, rules, regulations and laws promulgated by any governmental or quasi-governmental agency having jurisdiction over such Chicago taxicab vehicles, taxicab licenses and medallions as may be part of the Collateral; and shall obtain all taxicab license and medallion renewals, auto use tax permits, vehicle registrations and such other permits and licenses as may be required;

(w)   all of the required licenses, permits, accreditation and agreements required for operation of the Borrower's business have been obtained and that the Borrower shall at all times maintain an active operating business engaged in regular and continuous activity;

(x)   the Borrower shall promptly notify the Lender and deliver to the Lender a copy of any notice of default it may receive in connection with any of the Permitted Encumbrances;

(y)   the Borrower and each guarantor, if any, have been afforded time to retain legal counsel to represent them in this transaction.

5.   The Borrower hereby agrees that, without notice or further assent and without otherwise affecting the obligations of the parties hereto or the security interest granted hereunder, before, at or after the Maturity Date (as defined in the Note), expressed or declared: (a) the liability of the Borrower or any other party under the Note or for any other part of the Indebtedness, may, from time to time, in whole or in part, be renewed, extended, modified, prematured, compromised or released by the Lender, whether in bankruptcy proceedings or otherwise, as such Lender may deem advisable, and (b) the Lender may, from time to time, in its discretion, exchange, modify, release or surrender, in whole or in part, with or to the Borrower and its representatives or any other appropriate party, as the case may be, (i) any Collateral or any substitutes or additions thereto or (ii) the surplus net proceeds derived from the sale or sales or disposition of the Collateral by the Lender pursuant to the terms of this Agreement.

6.   The occurrence of any of the following events shall constitute an Event of Default under this Agreement:

(a)   if the Borrower shall not pay when due: (i) any installment of principal or interest under this Note; or (ii) any other payments due under the Note prior to the Maturity Date;

(b)   if the Borrower shall not pay when due, any other part of the Indebtedness or any other amount payable upon or in connection with the Indebtedness or any part thereof;

(c)   the failure of the Borrower to perform, and/or a breach by the Borrower of, any of the terms, covenants or conditions of this Agreement or the Note;

(d)   the failure of the Borrower or any guarantor to pay or bond any judgment against him within thirty (30) days after entry, or the filing of any tax deficiency notice or lien by the municipal, state or federal governments or agencies thereof;

(e)   the Borrower shall generally not be paying its debts as they mature or the Borrower or any guarantor shall file a petition in bankruptcy or take advantage of the Bankruptcy Code and/or any other law for the relief of debtors, or shall make an assignment for the benefit of creditors, or if a custodian or receiver shall be appointed for the property of the Borrower or any guarantor, or if an insolvency proceeding under any bankruptcy law or insolvency act shall be instituted against the Borrower or any guarantor and any such proceeding and/or appointment shall not be dismissed or vacated within thirty (30) days after such institution or appointment, or if the Borrower or any guarantor admits in writing its or his inability to pay its or his debts as they become due, or if the Borrower or any guarantor becomes insolvent howsoever otherwise evidenced;

(f)   the Borrower transfers, sells, exchanges or leases, assigns or grants, or makes or suffers any further pledge or encumbrance of or any further lien upon or further security interest in any of the Collateral or enters into any agreement to do any of the foregoing;

(g)   any of the representations and warranties made by the Borrower in this Agreement or in any other instrument executed in

connection with this Agreement or the Loan are or become materially untrue or incorrect or materially misleading;

(h)  if the Borrower or any other guarantor is a natural person, the death of such person; if the Borrower is a corporation, partnership or a joint venture, the death of a shareholder, general partner or member thereof, or the dissolution or other termination of the Borrower's existence;

(i)  the failure of the Borrower or any guarantor (or any shareholder, partner or member of the Borrower or of any guarantor) to perform or comply with any covenant or condition contained in any agreement to which the Lender and the Borrower or any guarantor or any such shareholder, partner or member are parties (including, without limitation, any guaranty or pledge agreement guaranteeing or securing the Borrower's obligations hereunder), without the benefit of any applicable grace period;

(j)  the failure of the Borrower to perform or comply with any covenant or condition contained in any agreement or document evidencing or creating any Permitted Encumbrance, without the benefit of any applicable grace period.

Upon the occurrence of an Event of Default, the Lender shall have the right to declare the entire amount of the Indebtedness and interest accrued thereon immediately due and payable by giving written notice thereof to the Borrower and, upon the giving of such notice, the Indebtedness shall be immediately due and payable by the Borrower to the Lender.

7.  In the event that the Lender elects to accelerate the Indebtedness as provided above and within ten (10) days after the mailing of such notice the Borrower fails to pay the Indebtedness, or, in any event, if the Borrower shall fail to pay the entire unpaid principal balance of the Note and accrued interest thereon upon the Maturity Date or any other part of the Indebtedness or interest thereon when it is due, then in any such events the Lender shall have the right, in addition to and in connection with any other rights it may have under the Note, this Agreement, the Uniform Commercial Code and otherwise at law or in equity, (a) to apply any cash which it received pursuant to the provisions of this Agreement to the payment of the Indebtedness, (b) to enter upon the Borrower's premises peaceably by the Lender's own means or with legal process and take possession of the Collateral, and the Borrower agrees not to resist or interfere, (c) to require the Borrower to assemble the Collateral and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties (it being agreed that the Borrower's address set forth above is a place reasonably convenient for such assembling), and (d) to sell, assign and deliver the Collateral at public or private sale, for cash, on credit or future delivery, with or without advertisement of the time, place or terms of sale and in connection therewith to grant options and to use the services of a broker, except that if the sale be a private sale upon five (5) days' written notice to the Borrower of the date, time and place of any sale and the terms of the sale, which notice the Borrower agrees is reasonable, all other demands, advertisements and notices being hereby waived.  Any sale shall be free of any and all equity or right of redemption, which Borrower hereby waives and releases. At any sale the Lender, or its designee, may purchase the Collateral.  The Lender shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given.  The Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time and if such sale be a private sale by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  If any of the Collateral is sold by the Lender upon credit or for future delivery, the Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of such failure, the Lender may resell such Collateral.  In no event shall the Borrower be credited with any part of the proceeds of sale of any Collateral until cash payment thereof has actually been received by the Lender.  In case of any sale, the Lender may first deduct all costs and expenses of collection, sale and delivery of the Collateral and any costs and expenses incidental thereto, including, without limitation, the expense of pursuing, searching for, receiving, taking, keeping and storing the Collateral, advertising the sale of the Collateral, reasonable attorneys' fees and disbursements, brokerage commissions and transfer fees and taxes, and shall apply any residue first to the payment of any accrued interest due under the Note and any other part of the Indebtedness and then to the payment of the unpaid principal balance thereof. The balance, if any, remaining after payment in full of the Indebtedness shall be paid to the Borrower, to the extent permitted by law, provided there are no other claimants.  Any sale conducted upon the foregoing terms or by any other method of sale (if conducted in conformity with practices of any banks disposing of similar security) shall be deemed commercially reasonable.  The Borrower agrees that the Lender shall have the right to continue to retain the Collateral until such time as the Lender, in its reasonable judgment, believes that an advantageous price can be obtained for the Collateral and, absent gross negligence, the Lender shall not be liable to the Borrower for any loss in the value of the Collateral by reason of any such retention of the Collateral by the Lender.  Further, the Lender may elect to retain the Collateral in full satisfaction of the Indebtedness, in which event notice thereof shall be given to the Borrower, and if the Lender receives an objection in writing from the Borrower within twenty-one (21) days after service of the notice, then and in such event the Lender shall commence to dispose of the Collateral in the manner hereinbefore set forth; provided, however, that if the net proceeds to be received from any disposition would be insufficient to satisfy in full the Indebtedness, the Lender shall not be compelled to go forward with such proposed disposition, and shall be entitled to retain the Collateral in full satisfaction of the Indebtedness despite any objection by the Borrower to such retention.

8.  The Borrower agrees that the Lender and its officers, agents and attorneys shall incur no liability to the Borrower in the event that the Lender or its Assignee transfers the Collateral in accordance with the provisions of this Agreement, or refused to effect any transfer of the Collateral attempted to be made by the Borrower without any consent or approval of the Lender required by the terms hereof, or refuses or fails to give any such consent or approval, and the Borrower hereby agrees to indemnify the Lender against any and all expenses, costs, liability and damages (including without limitation reasonable attorneys' fees and disbursements) incurred or sustained by reason of its acts or omissions, as aforesaid.

9.  The Borrower shall have no right to require that the Lender proceed against all or any part of the Collateral or any guaranty or real or personal property given as security for the Indebtedness whether or not existing or hereafter given in any order of priority before or after or contemporaneously with the exercise of the Lender's rights or remedies with respect to the Collateral.

10.  Effective upon the occurrence of an Event of Default, the Borrower hereby irrevocably appoints the Lender as the Borrower's attorney-in-fact coupled with an interest for the purpose of carrying out the provisions of this Agreement and taking any action and

executing any instrument which the Lender may deem necessary or advisable to accomplish the purposes hereof. Without limiting the foregoing, the Lender shall have the power in the place and stead of, and in the name of, the Borrower, or in its own name, to take any and all action to complete and deliver any collateral assignment delivered by Borrower herewith and to execute and deliver any and all agreements, certificates, documents and instruments that may be necessary or desirable, in its sole discretion, to realize upon the Collateral, including, without limiting the generality of the foregoing, to ask, demand, collect, and receive and give acquittances and receipts for any and all moneys due and to become due with respect to the Collateral; to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to the Collateral; and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise as may be deemed appropriate by it for the purpose of collecting any and all such moneys due with respect to the Collateral whenever payable; to direct any party liable for any payment with respect to the Collateral to make payment of any and all moneys due and to become due thereunder directly to the Lender or as the Lender shall direct; to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of the Collateral; to sign and endorse any assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of the Collateral; to defend any suit, action or proceeding brought against Borrower with respect to the Collateral; to collect and enforce the payment of any amounts due with respect to the Collateral by suit, proof of debt or claim or otherwise in any proceeding under the Federal Bankruptcy Code, or in any dissolution, insolvency, liquidation or other proceeding involving an adjustment of the indebtedness or interests in any obligor upon the Collateral or application of any assets of such obligor to the payment in liquidation thereof, or otherwise; and, in connection with any sale of the Collateral, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with the Collateral as fully and completely as though the Lender was the absolute owner thereof for all purposes, and to do, at the Lender's option and at the expense of the Borrower, at any time, or from time to time, all acts and things which the Lender deems necessary or desirable to protect, preserve or realize upon the Collateral in order to effect the intent of this Agreement, all as fully and effectively as the Borrower might do. The powers conferred on the Lender hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers, nor shall the Lender be responsible for or be deemed to have assumed any of the Borrower's liabilities or obligations under the Collateral. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Lender nor any of its officers, agents or designees shall be responsible to the Borrower for any act or failure to act, or for any error of judgment or mistake of fact or law. The Borrower agrees to indemnify, defend and hold harmless the Lender from and against any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or relating to the exercise by the Lender of any of its rights hereunder.

11. The remedies provided herein in favor of the Lender shall not be deemed exclusive, but shall be cumulative, and shall be in addition to all other remedies in favor of the Lender existing at law or in equity.

12. The Lender, at its option, without notice to or demand upon the Borrower and without waiving or releasing any default, may make any payments for the Borrower's account, or perform any of the Borrower's obligations under this Agreement or do any acts required to be done in order to prevent a default under or breach of this Agreement (including, without limitation, the payment of premiums for Borrower's insurance as required hereunder), but the Lender under no circumstances shall be obligated to do so. In the event the Lender makes any of the said payments or does any of said acts, said payments and the costs of said acts (including, without limitation, reasonable attorneys' fees and disbursements), together with interest thereon at the maximum legal rate, shall be added to the Indebtedness secured hereby, and shall be payable to the Lender by the Borrower on demand, whether or not any action or proceeding is commenced by or against the Lender. If any action or proceeding is commenced by the Lender, or if any action or proceeding is commenced by the Borrower or anyone else and the Lender is made a party thereto, in which action or proceeding it becomes necessary or desirable to foreclose, uphold or defend the security interest and lien created by this Agreement or to enforce, uphold or defend any of the rights granted to the Lender by this Agreement, all sums paid by the Lender for the expense of any such litigation and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements), so incurred together with interest thereon at the maximum legal rate, shall be added to the Indebtedness hereby secured and shall be payable to the Lender by the Borrower on demand.

13. The Lender shall have no duty as to the collection or protection of the Collateral or any income thereon or as to the preservation of any rights pertaining thereto, beyond the safe custody of any Collateral actually in its possession. The Borrower releases the Lender from any claims, causes of action and demands at any time arising out of or with respect to this Agreement, the Collateral and/or any actions taken or omitted to be taken by the Lender with respect thereto.

14. No delay on the part of the Lender in exercising any of its options, powers or rights, or partial or single exercise thereof, shall constitute a waiver thereof.

15. The Lender shall have the right to assign this Agreement and the Collateral and all of its rights, title and interest hereunder and in the Collateral without the Borrower's consent. Upon any such assignment, the Lender shall have no further liability or obligation hereunder.

16. Except as prohibited by statute, the Borrower shall, and hereby does, waive trial by jury in any action, proceeding or counterclaim brought by the Lender on any matter whatsoever arising out of or in any way connected with this Agreement, the Collateral and/or the relationship created thereby; and, with respect to any matter for which a jury trial cannot be waived, the Borrower agrees not to assert any such claim as a counterclaim in, or move to consolidate same with, any action or proceeding.

17. Any notice, demand or consent under this Agreement shall be in writing. Any notice or demand under this Agreement shall be deemed to have been sufficiently given for all purposes hereof   (a) if and when delivered personally or (b) if or when mailed by registered or certified mail, postage prepaid, return receipt requested, to the party at its address shown above and in the case of notice to the Lender, with a copy to Medallion Funding LLC, 437 Madison Avenue, 38th Floor, New York, New York 10022.

Any party hereto may designate a different address for the purpose of the service of notices hereunder by giving notice thereof in accordance with the provisions of this Paragraph.

18.  This Agreement shall inure to the benefit of and be binding upon, the Lender named herein, its successors, assigns and legal representatives.  Without intending to permit an assignment by the Borrower, this Agreement shall also bind the Borrower named herein, its successors, assigns and legal representatives.

19.  Except for those terms expressly defined herein, all other terms herein that are defined in the Uniform Commercial Code shall have the meanings therein stated.

20.  All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.  The term "Borrower" shall mean "Borrowers" if more than one person is the Borrower, and in such event, the obligations of the Borrower shall be joint and several.

21.  This Agreement and the rights and obligations of the Lender and the Borrower hereunder shall be construed in accordance with and governed by the laws of the State of Illinois.  This Agreement contains the full understanding of the parties with respect to the subject matter hereof.  This Agreement may not be terminated nor may any of its provisions be changed or waived, except by writing signed by the party against whom such termination, change or waiver is sought to be applied.  A waiver by the Lender of any default, right or remedy hereunder on any one occasion shall not be construed as a waiver of any other default or a bar to any right or remedy the Lender would otherwise have on any future occasion.

22.  In case any one or more of the provisions contained in this Agreement or any application thereof shall be deemed invalid, illegal or unenforceable in any respect, such affected provisions shall be construed and deemed rewritten so as to be enforceable to the maximum extent permitted by law, thereby implementing to the maximum extent possible, the intent of the parties hereto, and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

23.  If any amounts due under this Agreement or the Note are due upon demand or notice by the Lender and if the Lender does not demand or notice the same or if noticed, the period under the notice extends beyond the Maturity Date, then such amounts shall in any event be due and payable upon the Maturity Date.

24.  The Borrower agrees (a) to furnish to the Lender, with reasonable promptness, such financial and other information concerning the business, operations, assets and condition of the Borrower, financial or otherwise, as the Lender may reasonably request from time to time, and (b) at any reasonable time and from time to time to permit the Lender or any of its agents or representatives to examine and make copies of and abstracts from its books and records (including, without limitation, documents and records required to be kept by the Borrower according to the Rules of the City of Chicago Taxi and Department of Consumer Services), visit its places of business and garages in which its taxicab vehicles are maintained, and discuss its affairs, finances and accounts with the Borrower or any of its officers, directors, members, or partners, or its independent accountants, whom the Borrower shall direct to cooperate fully in any such discussions.  Further, at the request of the Lender made no less than two months after the end of the Borrower's fiscal year, the Borrower shall, within ten (10) days of such request, provide to Lender its annual balance sheet and certified financial statement for such fiscal year, certified by an independent certified public accountant.

25.  The Borrower shall, at any time and from time to time upon five (5) days' notice from the Lender, deliver to the Lender or its designees estoppel certificates as to the Collateral, certified by an officer or general partner of the Borrower, as the case may be, setting forth as of the date of such certificate the amounts paid and unpaid amounts due to the Lender upon the Indebtedness, whether any default or Event of Default has occurred with respect to such Collateral or this Agreement or any event has occurred or condition exists which, with the passage of time or the giving of notice, or both, would constitute a default or Event of Default under this Agreement (and if so, specifying the nature thereof).

26.  In the event that any payment due hereunder or under the Note and upon any other part of the Indebtedness is not received by the Lender within five (5) days of the date when such payment is due and payable, a late charge of five cents ($0.05) for each dollar ($1.00) so overdue may be charged by the Lender for the purpose of defraying the expense incident to handling such delinquent payment, which late charge shall be payable on demand.

27.  From and after the date of occurrence of an Event of Default or the Maturity Date, or, if any other sum is not paid when it is due hereunder, from and after the date when it is due, interest on the entire unpaid balance of the Indebtedness, and on any other sums payable hereunder to the Lender, shall accrue and be payable at the highest interest rate permitted by law.

28.  Borrower hereby authorizes Lender, Lender's agents and assigns to file and perfect UCC liens and to amend, modify and continue said liens as Lender deems necessary.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

BORROWER:  Tahoora Transportation Inc.

By:

**Mebrahtu T. Tsehay - President and Secretary**

LENDER: Medallion Financial Corp.

By:

## SCHEDULE A

**City of Chicago**
**Taxicab License**
**Medallion Number**

**1226TX**

All Stock of **Tahoora Transportation Inc.**

And such collateral as described in the UCC-1 Form executed herewith.

(Please note, this collateral may include collateral from one or more additional loans with this lender or its affiliates.)

_Mebrahtu T. Tsehay_
**Mebrahtu T. Tsehay**

## SCHEDULE B

### Permitted Encumbrances

**None**

Medallion #

THERE ARE NO OTHER PERMITTED ENCUMBRANCES OTHER THAN THOSE SET FORTH ABOVE.

STATE OF ILLINOIS)
: ss.:
COUNTY OF COOK )

     On the **24th** day of **July, 2013**, before me personally came **Mebrahtu T. Tsehay**, to me known, who, being by me duly sworn, did depose and say that he/she resides at **15 N. Delphia Avenue, Park Ridge, IL 60683**; that he/she is the President of **Tahoora Transportation Inc.**, the corporation described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by order of the board of directors of said corporation.

_____
          Notary Public

OFFICIAL SEAL
RITA RIVERA
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 08/28/2015

# EXHIBIT 3

## GUARANTY
### Medallion # 1226TX

In consideration of financial accommodations given or to be given or continued to **Tahoora Transportation Inc.** (the "Borrower"), by **Medallion Financial Corp.** (the "Lender"), the undersigned as primary obligor and not merely as a surety irrevocably and unconditionally guarantees to the Lender payment when due, whether by acceleration or otherwise, of any and all liabilities of the Borrower to the Lender, together with all interest thereon and all attorneys' fees, costs and expenses of collection incurred by the Lender in enforcing any of such liabilities.

The term "liabilities of the Borrower" shall include duties, debts, liabilities and obligations of the Borrower (or its successors, assigns or legal representatives) to the Lender, present or future, whether now or hereafter existing, contingent or absolute, howsoever arising or incurred or evidenced, including, without limitation, the duties, debts, liabilities and obligations of the Borrower under a certain Security Agreement dated **July 24, 2013** between the Borrower and the Lender and under a certain Promissory Note of even date herewith given by the Borrower to the Lender and evidencing a debt in the sum of **$240,000.00**.

The undersigned waives notice of acceptance of this guaranty and notice of any liability to which it may apply, and waives presentment, demand of payment, protest, notice of dishonor or nonpayment of any such liabilities, suit or taking other action by the Lender against, and any other notice to, any party liable thereon (including the undersigned).

The Lender may at any time and from time to time (whether or not after revocation or termination of this guaranty) without the consent of or (except as shall be required by applicable statute and cannot be waived) notice to the undersigned, without incurring responsibility to the undersigned, without impairing or releasing the obligations of the undersigned hereunder, upon or without any terms or conditions and in whole or in part:

(1) change the manner, place or terms of payment, and/or change or extend the time of payment of, renew or alter, any liability of the Borrower, any security therefor, or any liability incurred directly or indirectly in respect thereof, and the guaranty herein made shall apply to the liabilities of the Borrower as so changed, extended, renewed or altered;

(2) sell, exchange, release, surrender, realize upon or otherwise deal with any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the liabilities hereby guaranteed or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(3) exercise or refrain from exercising any rights against the Borrower or others (including the undersigned) or otherwise act or refrain from acting;

(4) settle or compromise any liability hereby guaranteed, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to creditors of the Borrower other than the Lender and the undersigned; and

(5) apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Lender regardless of what liability or liabilities of the Borrower remain unpaid.

No invalidity, irregularity or unenforceability of all or any part of the liabilities hereby guaranteed or of any security therefor or any other circumstance that might otherwise constitute a legal or equitable defense of a guarantor shall affect, impair or be a defense to this guaranty, and this guaranty is a primary obligation of the undersigned.

This guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. As to each of the undersigned, this guaranty shall continue until written notice of revocation signed by such undersigned, or until written notice of the death of such undersigned shall in each case have been actually received by the Lender, notwithstanding a revocation by, or the death of, or complete or partial release for any cause of, any one or more of the remainder of the undersigned, or of the Borrower or of anyone liable in any manner for the liabilities hereby guaranteed or of the liabilities (including those hereunder) incurred directly or indirectly in respect thereof or hereof, and notwithstanding the dissolution, termination or increase or change in personnel of any one or more of the undersigned which may be a partnership. No revocation or termination hereof shall affect in any manner rights arising under this guaranty with respect to (a) liabilities that shall have been created, contracted, assumed or incurred prior to receipt by the Lender of written notice of such revocation or termination or (b) liabilities which shall have been created, contracted, assumed or incurred after receipt of such written notice pursuant to any contract entered into by the Lender prior to receipt of such notice; and the sole effect of revocation or termination hereof shall be to exclude from this guaranty liabilities thereafter arising that are unconnected with liabilities therefore arising or transactions theretofore entered into.

All notices provided to be given to the Lender herein shall be sent by registered, certified mail, or federal express, return receipt requested.

Any and all rights and claims of the undersigned against the Borrower or any of its property, arising by reason of any payment by the undersigned to the Lender pursuant to the provisions of this guaranty, shall be subordinate and subject in right of payment to the prior payment in full of all liabilities of the Borrower to the Lender.

The happening of any of the following events shall constitute an "Event of Default" under this guaranty:

(a) any default with respect to payment or performance of the liabilities of the Borrower;

(b) any failure to perform and/or breach by the undersigned of any of the terms, covenants and conditions of this guaranty or the Pledge Agreement between the undersigned and the Lender of even date herewith or any other document or instrument delivered in connection herewith and securing the performance hereof by any of the undersigned;

(c) the death or insolvency (however evidenced) of the Borrower or any person (including the undersigned) who is liable directly or indirectly in respect of any of the liabilities of the Borrower;

(d) any change in the financial condition of the Borrower or any aforesaid person that the Lender, in its sole discretion, deems to be adverse;

(e) the suspension of business of the Borrower or any aforesaid person;

(f) the issuance of any warrant, process or order of attachment, garnishment or other lien and/or the filing of a lien as a result thereof against any of the property of the Borrower or any aforesaid person;

(g) the Borrower or any aforesaid person makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for the Borrower or any aforesaid person or for any property of any of them, or any proceeding is commenced by or against the Borrower or any aforesaid person under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, receivership,

4

liquidation or dissolution law or statute;

(h) it appears that any representation in any financial or other statement of the Borrower or any aforesaid person, delivered to the Lender by or on behalf of the Borrower or such person, is untrue or incomplete.

Upon the occurrence of an Event of Default, and at any time thereafter, the Lender may, without notice to the Borrower or any aforesaid person, make the liabilities of the Borrower to the Lender, whether or not then due, immediately due from and payable hereunder by the undersigned, and the Lender shall be entitled to enforce the obligations of the undersigned hereunder.

If claim is ever made upon the Lender for repayment or recovery of any amount or amounts received by the Lender in payment or on account of any of the liabilities of the Borrower and the Lender repays all or part of said amount of (a) any judgment, decree or order of any court or administrative body having jurisdiction over the Lender or any of its property, or (b) any settlement or compromise of any such claim effected by the Lender with any such claimant (including the Borrower), then and in such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any liability of the Borrower, and the undersigned shall be and remain liable to the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Lender.

Any acknowledgment or new promise, whether by payment of principal or interest or otherwise and whether by the Borrower or others (including the undersigned), with respect to any of the liabilities of the Borrower shall, if the statute of limitations in favor of the undersigned against the Lender shall have commenced to run, toll the running of such statute of limitations and, if the period of such statute of limitations shall have expired, prevent the operation of such statute of limitations.

The undersigned shall pay to the Lender all costs and expenses, including filing fees and attorneys' fees, incurred by the Lender in connection with the custody, care, preservation or collection of any of the property of the undersigned or in seeking to enforce any of the liabilities or obligations of the undersigned hereunder.

The Lender shall have the right, at any time and from time to time, without notice, to sell, assign, transfer or otherwise dispose of all or any part of its rights under this guaranty. In such event, each and every immediate and successive purchaser, assignee, transferee or holder of all or any part of such rights shall have the right to enforce this guaranty, by legal action or otherwise, for its own benefit as fully as if such purchaser, assignee, transferee or holder were by name specifically given such right. The Lender shall have an unimpaired right to enforce this guaranty for its benefit to that portion of the rights hereunder that were not sold, assigned, transferred or otherwise disposed of.

No delay on the part of the Lender in exercising any of its options, powers or rights, or partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modification or amendment of this guaranty, shall be deemed to be made by the Lender unless the same shall be in writing, duly signed on behalf of the Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of the Lender or the obligations of the undersigned to the Lender in any other respect at any other time.

The undersigned waives the right of trial by jury in the event of any litigation between the parties hereto in respect of any matter arising under this guaranty and agrees that, should the Lender bring any judicial proceedings in relation to any such matter, the undersigned will not interpose any counterclaim or setoff of any nature.

This guaranty and the rights and obligations of the Lender and of the undersigned hereunder shall be deemed to be a contract made under and shall be governed and construed in accordance with the laws of the State of Illinois, and this guaranty is binding upon the undersigned, his, their, or its executors, administrators, successors or assigns, and shall inure to the benefit of the Lender, its successors or assigns. In the event that the Lender brings any action or suit in any court of record of the State of Illinois or of the United States to enforce any or all liabilities of the undersigned hereunder, service of process may be made upon the undersigned by mailing a copy of the summons to the undersigned at the address below set forth.

In case one or more of the provisions contained in this guaranty shall be or shall be deemed to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

The rights, remedies, powers and privileges of the Lender hereunder are cumulative and not conclusive of any other rights, remedies, powers or privileges now or hereafter existing at law or in equity.

This guaranty may be signed in any number of counterparts with the same effect as if the signatures thereto and hereof were upon the same instrument.

The undersigned, if more than one, shall be jointly and severally liable hereunder and the term "undersigned" wherever used herein shall mean the undersigned or any one or more of them. Anyone signing this guaranty shall be bound hereby, whether or not anyone else signs this guaranty at any time. The term "Lender" includes any agent of the Lender acting for it.

This Agreement is secured by a Pledge Agreement dated of even date herewith between the undersigned and the Lender.

Dated: <u>July 24, 2013</u>

**Mebrahtu T. Tsehay** - Individual Guarantor

Address: **15 N. Delphia Avenue, Park Ridge, IL 60683**

S.S # / Tax I.D.

Tax I.D.:

STATE OF ILLINOIS)
           : ss.:
COUNTY OF COOK )

        On the **24th** day of **July, 2013**, before me personally came **Mebrahtu T. Tsehay, President and Secretary**, Individual Guarantor, to me known to be the individual(s) described in and which executed the foregoing instrument; and that he/she acknowledged that he/she executed the same.

_____
        Notary Public

OFFICIAL SEAL
RITA RIVERA
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 08/28/2015

6

# EXHIBIT 4

**Medallion Financial Corp.**

## PROMISSORY NOTE

**Medallion # 4307TX**
**July 24, 2013**

**$240,000.00**

FOR VALUE RECEIVED, the undersigned, **Shere Corp.**, (the "Borrower"), located at **4626 W. Cornelia Avenue, Chicago, IL 60641**, promises to pay to the order of **Medallion Financial Corp.** (the "Lender"), in lawful money of the United States, at 111 W. Washington Street, Suite 1270, Chicago, Illinois 60602, or at such other place as may be designated in writing by the holder of this Note, the principal sum of **Two Hundred Forty Thousand Dollars ($240,000.00)**, with interest thereon to be computed and paid from the date of this Note until **July 24, 2018** (the "Maturity Date"), at the rate of **five and 25/100 percent (5.25%)** per annum except as set forth below, in constant monthly installments of **$1,545.40**, commencing on **August 24, 2013**, and on the **24th** day of each month thereafter until the Maturity Date, at which time all unpaid principal balance and accrued interest shall be due and payable. All payments, including but not limited to, monthly installment payments, shall be applied first to any outstanding charges, fees, costs or expenses incurred, then to accrued interest, and then to the outstanding principal.

If the execution of this note and the disbursement of funds there from do not occur simultaneously, then Lender may elect, in its sole untrammeled discretion, to extend: (1) the initial date upon which interest begins to accrue, or (2) the date upon which the loan ultimately matures, or both. But such extension will in no event exceed the number of days which elapsed between execution and initial disbursement of the loan proceeds or any portion thereof.

Notwithstanding the foregoing, if (i) there shall occur an "Event of Default" under the Security Agreement described below (as such term is defined in the Security Agreement) or (ii) the Maturity Date shall occur, or (iii) any sum shall not be paid when it is due hereunder, then from and after any such occurrence or nonpayment the undersigned shall pay interest to the Lender, on demand, on the entire principal amount then outstanding hereunder and/or under the Security Agreement at the highest rate permitted by law.

Interest shall be computed on the basis of a **360-day year for the actual** number of days elapsed. Under no circumstances shall the undersigned be charged more than the highest rate of interest which lawfully may be charged by the holder hereof and paid by the undersigned on the indebtedness evidenced hereby.

It is, therefore, agreed that if at any time interest on the indebtedness evidenced hereby would otherwise exceed the highest lawful rate, only such highest lawful rate will be paid by the undersigned. Should any amount be paid by the undersigned in excess of such highest lawful amount, such excess shall be deemed to have been paid in reduction of the principal balance thereof.

In the event that any payment due hereunder shall not be received by the Lender within ten (10) days of the date when such payment is due and payable, a late charge of five cents ($0.05) for each dollar ($1.00) so overdue may be charged by the Lender.

This Note is a promissory note and is secured by a Security Agreement of even date herewith between the undersigned and the Lender (the "Security Agreement") affecting property more particularly described therein, and all of the covenants, conditions and agreements contained in the Security Agreement are by this reference incorporated herein and made a part hereof. At the option of the holder of this Note and upon the terms and conditions provided in the Security Agreement, upon (a) a default in making any payment of principal and interest hereunder when due and payable, and such default continuing beyond the applicable grace period, if any, or (b) the occurrence of an Event of Default (as such term is defined in the Security Agreement), the unpaid principal balance hereof and all accrued interest shall become immediately due and payable. In enforcing its rights under this Note and under such Security Agreement and other instruments delivered in connection with the loan represented hereby, the holder shall have the right and option to pursue its remedies with respect to this Note or to enforce the provisions of the Security Agreement or such other instruments, or any combination thereof, and either simultaneously or in such order as the holder shall deem in its best interest.

The undersigned, and all persons liable or to become liable on this Note, agree, jointly and severally, to pay all costs of collection, including reasonable attorneys' fees and disbursements, in case the unpaid principal balance of this Note, or any payment of principal and/or interest thereon, is not paid when due, or in case it becomes necessary to protect the security for the indebtedness evidenced hereby, whether suit be brought or not.

This Note may be prepaid in whole or in part at any time, provided that (i) the undersigned give the Lender written notice of the prepayment at least thirty (30) days but not more than forty-five (45) days prior to such prepayment, which notice shall expressly set forth the date such prepayment is to be made (the "Noticed Prepayment Date"); (ii) all accrued interest has been paid to the date of such prepayment; (iii) the undersigned pay to the Lender a prepayment fee equal to an additional ninety (90 days) days' interest at the rate herein set forth on the amount of the principal being repaid; and (iv) if the prepayment is not made on the Noticed Prepayment Date, the undersigned shall provide the Lender with an additional thirty (30) days' prior written notice and designate a new Noticed Prepayment Date. This fee shall not apply if the loan is pre-paid after the 1st 12 months of the original or modified loan term. If this Note is prepaid in part, then any such payments shall be applied against the payments due hereunder in inverse order of maturity.

If the due date of any required payment under this Note is not a "business day" (for this purpose, any day other than a Saturday, Sunday or legal holiday observed in the State of New York), such required payment shall be due and payable on the immediately succeeding business day.

2

Notwithstanding any and all prepayment and other applicable penalties sent forth herein and in the other documents relating to this loan, if during the term of this Loan, and for a period of ninety (90) days thereafter, the borrower receives a solicited or unsolicited bona fide offer from a third party to provide Borrower with funds for the purpose of the repayment, in whole or in part, of this Loan, and Borrower wishes to accept such replacement financing, Borrower shall first provide to Lender the actual written evidence of such financing terms being offered by the third party.  Lender shall have ten (10) business days from the receipt thereof to exercise the right "but not the obligation" to provide such financing to the Borrower at the terms set forth in the third party term sheet (which shall not be inclusive of any and all prepayment or other penalties set forth herein and in the other the documents relating to this Loan that Borrower will remain fully responsible for), and Borrower shall enter into a Loan modification agreement with Lender setting forth such new loan terms.  If Lender fails to so elect within ten (10) business days, Borrower shall be permitted to accept the third party offer and repay all or part of the loan, in which case any and all prepayment and other applicable penalties shall be applied.

At any time during the term of this loan, Lender may require the Borrower to establish an automatic payment account, i.e., Electronic Funds Transfer, for the purpose of making loan payments in lieu of a voucher or check writing system. Within five (5) days of Lender giving the Borrower notice of such requirement, Borrower shall immediately furnish all information and authorizations that Lender requires to establish such automatic debit collection system, including but not limited to any and all checking accounts, bank accounts, and authorization required by the financial institution selected to establish such automatic payment and debit system. Borrower agrees that in the event Lender establishes such automatic payment account, Borrower will maintain a sufficient balance in such account to ensure that funds are available for making the loan payments to Lender on the respective due dates of such payments. The automatic debit will take place five (5) days after the stated due date. In the event that an automatic debit is returned by the Borrower's bank for any reason whatsoever, the account will be charged a $50.00 fee. The failure of Borrower to establish such automatic account and/or to furnish any other item requested by Lender for the purpose of establishing such account, and/or the failure of the Borrower to maintain a sufficient amount of funds in such account to insure that sufficient funds are available in such account to pay the loan payments as they become due, shall constitute an event of default by borrower under this Loan Agreement, the Promissory Note, and Security Agreement of even date giving Lender any and all such rights as the Lender may have in the event of a borrower's default.

Any payment of the principal balance of this Note after the Lender shall have declared the unpaid principal balance hereof and all accrued interest immediately due and payable in accordance with the provisions of this Note or the Security Agreement shall be deemed to be a voluntary prepayment for all purposes hereof, and a prepayment fee calculated pursuant to the provisions of the immediately preceding paragraph shall be payable with respect thereto.

This Note shall be governed by and interpreted in accordance with the laws of the State of Illinois.

Shere Corp.                         By: _____

Mebrahtu T. Tsehay - President and Secretary

STATE OF ILLINOIS)
                 : ss.:
COUNTY OF COOK )

On the 24th day of July, 2013, before me personally came Mebrahtu T. Tsehay, to me known, who, being by me duly sworn, did depose and say that he/she resides at 15 N. Delphia Avenue, Park Ridge, IL 60683; that he/she is the President and Secretary of Shere Corp., the corporations described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by order of the board of directors of said corporations.

_____
Notary Public

OFFICIAL SEAL
RITA RIVERA
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 08/28/2015

3

# EXHIBIT 5

## SECURITY AGREEMENT

Medallion # **4307TX**

AGREEMENT, made **July 24, 2013**, by and between **Shere Corp.**, having an address at **4626 W. Cornelia Avenue, Chicago, IL 60641** (the "Borrower"), and Medallion Financial Corp. having an office at 111 W. Washington, Suite 1270, Chicago, Illinois 60602 (the "Lender").

W I T N E S S E T H :

WHEREAS the Borrower has requested that Lender make available the financial accommodations hereinafter set forth and in order to induce the Lender to make such accommodations wishes to assign to Lender the Collateral (as hereinafter defined);

WHEREAS the Lender is willing to extend such financial accommodations to the Borrower upon and subject to the terms and conditions set forth in this Agreement; and

WHEREAS the Borrower has executed and delivered to the Lender a note (the "Note") dated of even date herewith and payable to the order of the Lender in the principal sum of **Two Hundred Forty Thousand Dollars** (**$240,000.00**), which Note evidences a certain loan in such amount made by the Lender to the Borrower (the "Loan").

NOW THEREFORE, in condition of the mutual covenants herein contained and to secure the payment of the Indebtedness, it is hereby agreed as follows:

1. The principal amount of the Loan shall be repaid by the Borrower in the manner described in the Note, with interest described therein. The principal sum of the Note, together with all payments due hereunder or under the Note and all other sums that may be advanced by the Lender pursuant to the Note and any other indebtedness or liability of the Borrower to the Lender, direct or indirect, absolute or contingent due or to become due, now existing or hereafter arising, including all future advances or loans that may be made at the option of the Lender, together with any interest due and payable with respect to any of the foregoing until all such sums and the interest thereon are paid, are hereinafter collectively referred to as the "Indebtedness."

2. The term "Collateral" as used herein, shall refer, collectively, to the following property, whether now owned or hereafter acquired by the Borrower and whether or not purchased with proceeds of the Loan or with other sums advanced by the Lender:
    (a) All of the taxicab vehicles, City of Chicago taxicab licenses and representative medallions (including, without limitation, those vehicles, licenses and medallions described on Schedule A, annexed hereto), taxicab roof lights, taximeters and all other items of property owned by the Borrower or in which the Borrower has rights and used or useful in conjunction with the Borrower's operation of its business;

    (b) Any subscription right granted to the Borrower by the City of Chicago to purchase one or more additional taxicab licenses and representative medallions or any partial interest therein;

    (c) All other personal property owned by the Borrower or in which the Borrower has rights, including, without limitation, all furniture, fixtures, equipment, machinery, inventories, contract rights, moneys, accounts, general intangibles, goods, instruments, documents and chattel paper (except, if the Borrower is a natural person, only to the extent that such personal property is related to or used or useful in conjunction with Borrower's business); and

    (d) All substitutions for, all additions to and all proceeds and products of all of the foregoing property described in subparagraphs (a), (b) and (c) of this Paragraph 2 in any form whatsoever (including, without limitation, all proceeds of insurance thereon).

3. In order to secure (i) the full and timely payment of the Indebtedness and (ii) the performance and observance of the Borrower's obligations under this Agreement and the Note as such obligations now exist or may exist in the future, the Borrower hereby

    (a) Grants to the Lender a continuing security interest and lien in and to all of the Collateral. The security interest and lien created hereby shall remain in full force and effect until the Indebtedness has been paid in full, at which time the security interest and lien created hereby shall cease and terminate and this Agreement shall be deemed terminated without further liability on the part of any party to the other;

    (b) Assigns and absolutely transfers to Lender all the right, title and interest of Borrower in, to and under all leases/management agreements for the use of the medallions and other collateral described in attached Schedule "A" together with all the rents, royalties, issues, profits, income, security deposits, and other benefits at any time occurring with respect to the leases/management agreements (collectively, the "Rents") and all extensions, renewals, modifications or replacements of the leases, and together with any and all guarantees of the obligations of the managers/lessees of the leases/management agreements, whether now existing or as signed after the date of the assignment contained in this Security Agreement, and all extensions and renewals of the guarantees.

4. The Borrower makes the following representations, covenants and warranties to the Lender (which representations, covenants and warranties shall survive the execution and delivery of this Agreement) and agrees with the Lender as follows:

    (a) the Borrower shall pay the Indebtedness and shall perform all of the obligations of this Agreement in accordance with the

19

terms hereof;

(b) the Borrower is an active small business concern and the sole owner of record of, and has the entire beneficial interest in and good title to the Collateral, free and clear of all claims, pledges, liens encumbrances and security interests of every nature whatsoever (except for the security interest and lien created hereby for the benefit of the Lender and except for the security interests and liens, if any, described on Schedule B, annexed hereto, which security interests and liens are referred to collectively herein as the "Permitted Encumbrances");

(c) the Borrower has the full and unconditional right to grant to the Lender the security interest and lien granted herein; no terms or conditions of this Agreement are in violation of the provisions of any other agreement to which the Borrower is a party;

(d) all of the documents which comprise the Collateral are valid, binding and enforceable in accordance with their respective terms;

(e) the Borrower does and will forever warrant and defend the Lender's right, title, priority, lien and security interest in and on the Collateral against the claims and demands of all persons whosoever (except for Permitted Encumbrances);

(f) the Borrower and any guarantors have not been known by any other name during the last ten years;

(g) there is no action or proceeding pending, or to the knowledge of the Borrower, threatened, which in any way might materially and adversely affect (i) the rights of the Lender under this Agreement, (ii) the Borrower's or any guarantor's ability to perform its obligations hereunder, (iii) title to the Collateral, or (iv) the validity or priority of the security interest and lien in and on the Collateral created hereunder;

(h) there are no judgments against the Borrower unpaid or unsatisfied of record in any court of this state or of the United States; no bankruptcy proceedings have ever been instituted by or against the Borrower; and at no time has the Borrower made an assignment for the benefit of creditors;

(i) the Borrower shall not, without the Lender's prior written consent and in accordance with the conditions of any such consent and in full compliance with the terms hereof and all applicable laws, rules, regulations and orders; make or suffer (i) any sale, assignment or other transfer of, (ii) any further pledge or encumbrance of, or (iii) any further lien upon or security interest in, all or any part of the Collateral.

(j) the Borrower shall pay, when due, all taxes, assessments (including, without limitation, fines and penalties imposed or assessed by reason of the Borrower's operation of its taxicab vehicles, taxicab licenses and medallions) and license fees related to the Collateral and, if the Borrower is a corporation, to the operation of the corporation, and shall keep the Collateral free and clear of all liens, charges, taxes and assessments;

(k) the Borrower, without cost or expense to the Lender, shall execute, deliver, file and record such further agreements, instruments and documents as the Lender may require, including, without limitation, financing statements covering the Collateral and amendments to such financing statements, to impose, perfect, protect and continue the security interest and lien created and granted herein, and hereby irrevocably authorizes the Lender to execute, in the name of the Borrower, any such agreements, instruments and documents and to file and record the same so long as the same does not increase the Borrower's obligations or reduce its rights under this Agreement; and the Lender is authorized to file one or more financing statements covering the Collateral signed only by the Lender;

(l) the Borrower shall keep the Collateral at the Borrower's garage at the address set forth on the annexed Schedule A and shall not remove same (except in the usual course of business for temporary periods) without the prior written consent of the Lender;

(m) the Borrower, at its own cost and expense, shall keep the Collateral in good repair and condition and shall not misuse or waste the Collateral, or allow the Collateral to deteriorate except for normal wear and tear, and shall replace any taxicab vehicle that is unsafe or unfit for regular, continuous service, and shall make the Collateral available for inspection by the Lender at all reasonable times;

(n) the security interest created by this Agreement is security for the repayment of a loan or advance to be used solely for business purposes; to the extent that such loan or advance is to be used to pay all or part of the purchase price of the Collateral or any part thereof, the Borrower agrees to use the proceeds of the loan or advance to pay such purchase price;

(o) the Borrower shall maintain liability insurance, including excess coverage, for each of its taxicab vehicles in an amount not less than the minimum required pursuant to all applicable Chicago ordinances, all of which insurance shall be under policies and with insurers authorized and licensed to do business in the State of Illinois and acceptable to the Lender, and which policies shall provide for all losses to be paid to the Lender and for at least thirty (30) days' prior written notice to the Lender of any intended cancellation or modification thereof;

(p) the Borrower shall deliver to the Lender the policies and certificates of insurance with evidence of payment of the premiums thereon;

(q) the Borrower shall give immediate written notice to the Lender and to insurers of loss or damage to the Collateral and shall promptly file proof of loss with said insurers; the Borrower shall fully cooperate with its insurers in reporting, investigating, and prosecuting or defending, as the case may be, any claim by, on behalf of or against the Borrower arising out of the operation of its taxicab vehicles or otherwise in connection with its business; the Borrower hereby irrevocably authorizes the Lender to file claims, and the Lender shall have the sole right to adjust, settle and collect claims under said insurance in the name of the Borrower and the Lender

by such means, at such times and on such terms as the Lender may determine, and in the name and on behalf of the Borrower to execute releases and endorse checks or drafts payable in respect of any such insurance claims; and the Borrower hereby assigns to the Lender all sums that may become payable under such insurance, including return of premiums and dividends, as additional security for the Indebtedness;

(r) the Borrower shall notify the Lender immediately in writing of any change in or discontinuance of the Borrower's place or places of business;

(s) the Borrower shall notify the Lender immediately in writing of any events or circumstances that at any time may cause the representations and warranties herein to cease to be true;

(t) the Borrower shall notify the Lender immediately in writing if it obtains any substitutions for or replacements of its taxicab vehicles, licenses and medallions, roof lights or taximeters, or any other part of the Collateral; all of which substitutions and replacements shall constitute collateral for all purposes hereunder;

(u) the Lender, in any action to enforce, foreclose or protect the security interest and lien created and granted hereby, shall be entitled, without notice and without regard to the adequacy of any security held by the Lender for the Indebtedness, to the appointment of a receiver;

(v) The Borrower (or, if the Borrower is a corporation, partnership or joint venture, each officer, general partner or member of the Borrower, as the case may be) has read and is familiar with the Rules, Requirements and Procedures Governing Owners of Medallions Taxicabs as promulgated by the City of Chicago Taxi and Department of Consumer Services (the "Rules"); and the Borrower shall comply with said Rules and with any and all other applicable terms, provisions, rules, regulations and laws promulgated by any governmental or quasi-governmental agency having jurisdiction over such Chicago taxicab vehicles, taxicab licenses and medallions as may be part of the Collateral; and shall obtain all taxicab license and medallion renewals, auto use tax permits, vehicle registrations and such other permits and licenses as may be required;

(w) all of the required licenses, permits, accreditation and agreements required for operation of the Borrower's business have been obtained and that the Borrower shall at all times maintain an active operating business engaged in regular and continuous activity;

(x) the Borrower shall promptly notify the Lender and deliver to the Lender a copy of any notice of default it may receive in connection with any of the Permitted Encumbrances;

(y) the Borrower and each guarantor, if any, have been afforded time to retain legal counsel to represent them in this transaction.

5.   The Borrower hereby agrees that, without notice or further assent and without otherwise affecting the obligations of the parties hereto or the security interest granted hereunder, before, at or after the Maturity Date (as defined in the Note), expressed or declared: (a) the liability of the Borrower or any other party under the Note or for any other part of the Indebtedness, may, from time to time, in whole or in part, be renewed, extended, modified, prematured, compromised or released by the Lender, whether in bankruptcy proceedings or otherwise, as such Lender may deem advisable, and (b) the Lender may, from time to time, in its discretion, exchange, modify, release or surrender, in whole or in part, with or to the Borrower and its representatives or any other appropriate party, as the case may be, (i) any Collateral or any substitutes or additions thereto or (ii) the surplus net proceeds derived from the sale or sales or disposition of the Collateral by the Lender pursuant to the terms of this Agreement.

6.   The occurrence of any of the following events shall constitute an Event of Default under this Agreement:

(a) if the Borrower shall not pay when due:  (i) any installment of principal or interest under this Note; or (ii) any other payments due under the Note prior to the Maturity Date;

(b) if the Borrower shall not pay when due, any other part of the Indebtedness or any other amount payable upon or in connection with the Indebtedness or any part thereof;

(c) the failure of the Borrower to perform, and/or a breach by the Borrower of, any of the terms, covenants or conditions of this Agreement or the Note;

(d) the failure of the Borrower or any guarantor to pay or bond any judgment against him within thirty (30) days after entry, or the filing of any tax deficiency notice or lien by the municipal, state or federal governments or agencies thereof;

(e) the Borrower shall generally not be paying its debts as they mature or the Borrower or any guarantor shall file a petition in bankruptcy or take advantage of the Bankruptcy Code and/or any other law for the relief of debtors, or shall make an assignment for the benefit of creditors, or if a custodian or receiver shall be appointed for the property of the Borrower or any guarantor, or if an insolvency proceeding under any bankruptcy law or insolvency act shall be instituted against the Borrower or any guarantor and any such proceeding and/or appointment shall not be dismissed or vacated within thirty (30) days after such institution or appointment, or if the Borrower or any guarantor admits in writing its or his inability to pay its or his debts as they become due, or if the Borrower or any guarantor becomes insolvent howsoever otherwise evidenced;

(f) the Borrower transfers, sells, exchanges or leases, assigns or grants, or makes or suffers any further pledge or encumbrance of or any further lien upon or further security interest in any of the Collateral or enters into any agreement to do any of the foregoing;

(g) any of the representations and warranties made by the Borrower in this Agreement or in any other instrument executed in

connection with this Agreement or the Loan are or become materially untrue or incorrect or materially misleading;

(h)   if the Borrower or any other guarantor is a natural person, the death of such person; if the Borrower is a corporation, partnership or a joint venture, the death of a shareholder, general partner or member thereof, or the dissolution or other termination of the Borrower's existence;

(i)   the failure of the Borrower or any guarantor (or any shareholder, partner or member of the Borrower or of any guarantor) to perform or comply with any covenant or condition contained in any agreement to which the Lender and the Borrower or any guarantor or any such shareholder, partner or member are parties (including, without limitation, any guaranty or pledge agreement guaranteeing or securing the Borrower's obligations hereunder), without the benefit of any applicable grace period;

(j)   the failure of the Borrower to perform or comply with any covenant or condition contained in any agreement or document evidencing or creating any Permitted Encumbrance, without the benefit of any applicable grace period.

Upon the occurrence of an Event of Default, the Lender shall have the right to declare the entire amount of the Indebtedness and interest accrued thereon immediately due and payable by giving written notice thereof to the Borrower and, upon the giving of such notice, the Indebtedness shall be immediately due and payable by the Borrower to the Lender.

7.   In the event that the Lender elects to accelerate the Indebtedness as provided above and within ten (10) days after the mailing of such notice the Borrower fails to pay the Indebtedness, or, in any event, if the Borrower shall fail to pay the entire unpaid principal balance of the Note and accrued interest thereon upon the Maturity Date or any other part of the Indebtedness or interest thereon when it is due, then in any such events the Lender shall have the right, in addition to and in connection with any other rights it may have under the Note, this Agreement, the Uniform Commercial Code and otherwise at law or in equity, (a) to apply any cash which it received pursuant to the provisions of this Agreement to the payment of the Indebtedness, (b) to enter upon the Borrower's premises peaceably by the Lender's own means or with legal process and take possession of the Collateral, and the Borrower agrees not to resist or interfere, (c) to require the Borrower to assemble the Collateral and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties (it being agreed that the Borrower's address set forth above is a place reasonably convenient for such assembling), and (d) to sell, assign and deliver the Collateral at public or private sale, for cash, on credit or future delivery, with or without advertisement of the time, place or terms of sale and in connection therewith to grant options and to use the services of a broker, except that if the sale is a private sale upon five (5) days' written notice to the Borrower of the date, time and place of any sale and the terms of the sale, which notice the Borrower agrees is reasonable, all other demands, advertisements and notices being hereby waived.  Any sale shall be free of any and all equity or right of redemption, which Borrower hereby waives and releases. At any sale the Lender, or its designee, may purchase the Collateral.  The Lender shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given.  The Lender may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time and if such sale be a private sale by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  If any of the Collateral is sold by the Lender upon credit or for future delivery, the Lender shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of such failure, the Lender may resell such Collateral.  In no event shall the Borrower be credited with any part of the proceeds of sale of any Collateral until cash payment thereof has actually been received by the Lender.  In case of any sale, the Lender may first deduct all costs and expenses of collection, sale and delivery of the Collateral and any costs and expenses incidental thereto, including, without limitation, the expense of pursuing, searching for, receiving, taking, keeping and storing the Collateral, advertising the sale of the Collateral, reasonable attorneys' fees and disbursements, brokerage commissions and transfer fees and taxes, and shall apply any residue first to the payment of any accrued interest due under the Note and any other part of the Indebtedness and then to the payment of the unpaid principal balance thereof. The balance, if any, remaining after payment in full of the Indebtedness shall be paid to the Borrower, to the extent permitted by law, provided there are no other claimants.  Any sale conducted upon the foregoing terms or by any other method of sale (if conducted in conformity with practices of any banks disposing of similar security) shall be deemed commercially reasonable.  The Borrower agrees that the Lender shall have the right to continue to retain the Collateral until such time as the Lender, in its reasonable judgment, believes that an advantageous price can be obtained for the Collateral and, absent gross negligence, the Lender shall not be liable to the Borrower for any loss in the value of the Collateral by reason of any such retention of the Collateral by the Lender.  Further, the Lender may elect to retain the Collateral in full satisfaction of the Indebtedness, in which event notice thereof shall be given to the Borrower, and if the Lender receives an objection in writing from the Borrower within twenty-one (21) days after service of the notice, then and in such event the Lender shall commence to dispose of the Collateral in the manner hereinbefore set forth; provided, however, that if the net proceeds to be received from any disposition would be insufficient to satisfy in full the Indebtedness, the Lender shall not be compelled to go forward with such proposed disposition, and shall be entitled to retain the Collateral in full satisfaction of the Indebtedness despite any objection by the Borrower to such retention.

8.   The Borrower agrees that the Lender and its officers, agents and attorneys shall incur no liability to the Borrower in the event that the Lender or its Assignee transfers the Collateral in accordance with the provisions of this Agreement, or refused to effect any transfer of the Collateral attempted to be made by the Borrower without any consent or approval of the Lender required by the terms hereof, or refuses or fails to give any such consent or approval, and the Borrower hereby agrees to indemnify the Lender against any and all expenses, costs, liability and damages (including without limitation reasonable attorneys' fees and disbursements) incurred or sustained by reason of its acts or omissions, as aforesaid.

9.   The Borrower shall have no right to require that the Lender proceed against all or any part of the Collateral or any guaranty or real or personal property given as security for the Indebtedness whether or not existing or hereafter given in any order of priority before or after or contemporaneously with the exercise of the Lender's rights or remedies with respect to the Collateral.

10.   Effective upon the occurrence of an Event of Default, the Borrower hereby irrevocably appoints the Lender as the Borrower's attorney-in-fact coupled with an interest for the purpose of carrying out the provisions of this Agreement and taking any action and

executing any instrument which the Lender may deem necessary or advisable to accomplish the purposes hereof. Without limiting the foregoing, the Lender shall have the power in the place and stead of, and in the name, of the Borrower, or in its own name, to take any and all action to complete and deliver any collateral assignment delivered by Borrower herewith and to execute and deliver any and all agreements, certificates, documents and instruments that may be necessary or desirable, in its sole discretion, to realize upon the Collateral, including, without limiting the generality of the foregoing, to ask, demand, collect, and receive and give acquittances and receipts for any and all moneys due and to become due with respect to the Collateral; to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to the Collateral; and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise as may be deemed appropriate by it for the purpose of collecting any and all such moneys due with respect to the Collateral whenever payable; to direct any party liable for any payment with respect to the Collateral to make payment of any and all moneys due and to become due thereunder directly to the Lender or as the Lender shall direct; to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of the Collateral; to sign and endorse any assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of the Collateral; to defend any suit, action or proceeding brought against Borrower with respect to the Collateral; to collect and enforce the payment of any amounts due with respect to the Collateral by suit, proof of debt or claim or otherwise in any proceeding under the Federal Bankruptcy Code, or in any dissolution, insolvency, liquidation or other proceeding involving an adjustment of the indebtedness or interests in any obligor upon the Collateral or application of any assets of such obligor to the payment in liquidation thereof, or otherwise; and, in connection with any sale of the Collateral, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with the Collateral as fully and completely as though the Lender was the absolute owner thereof for all purposes, and to do, at the Lender's option and at the expense of the Borrower, at any time, or from time to time, all acts and things which the Lender deems necessary or desirable to protect, preserve or realize upon the Collateral in order to effect the intent of this Agreement, all as fully and effectively as the Borrower might do. The powers conferred on the Lender hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers, nor shall the Lender be responsible for or be deemed to have assumed any of the Borrower's liabilities or obligations under the Collateral. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Lender nor any of its officers, agents or designees shall be responsible to the Borrower for any act or failure to act, or for any error of judgment or mistake of fact or law. The Borrower agrees to indemnify, defend and hold harmless the Lender from and against any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or relating to the exercise by the Lender of any of its rights hereunder.

11.   The remedies provided herein in favor of the Lender shall not be deemed exclusive, but shall be cumulative, and shall be in addition to all other remedies in favor of the Lender existing at law or in equity.

12.   The Lender, at its option, without notice to or demand upon the Borrower and without waiving or releasing any default, may make any payments for the Borrower's account, or perform any of the Borrower's obligations under this Agreement or do any acts required to be done in order to prevent a default under or breach of this Agreement (including, without limitation, the payment of premiums for Borrower's insurance as required hereunder), but the Lender under no circumstances shall be obligated to do so. In the event the Lender makes any of the said payments or does any of said acts, said payments and the costs of said acts (including, without limitation, reasonable attorneys' fees and disbursements), together with interest thereon at the maximum legal rate, shall be added to the Indebtedness secured hereby, and shall be payable to the Lender by the Borrower on demand, whether or not any action or proceeding is commenced by or against the Lender. If any action or proceeding is commenced by the Lender, or if any action or proceeding is commenced by the Borrower or anyone else and the Lender is made a party thereto, in which action or proceeding it becomes necessary or desirable to foreclose, uphold or defend the security interest and lien created by this Agreement or to enforce, uphold or defend any of the rights granted to the Lender by this Agreement, all sums paid by the Lender for the expense of any such litigation and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements), so incurred together with interest thereon at the maximum legal rate, shall be added to the Indebtedness hereby secured and shall be payable to the Lender by the Borrower on demand.

13.   The Lender shall have no duty as to the collection or protection of the Collateral or any income thereon or as to the preservation of any rights pertaining thereto, beyond the safe custody of any Collateral actually in its possession. The Borrower releases the Lender from any claims, causes of action and demands at any time arising out of or with respect to this Agreement, the Collateral and/or any actions taken or omitted to be taken by the Lender with respect thereto.

14.   No delay on the part of the Lender in exercising any of its options, powers or rights, or partial or single exercise thereof, shall constitute a waiver thereof.

15.   The Lender shall have the right to assign this Agreement and the Collateral and all of its rights, title and interest hereunder and in the Collateral without the Borrower's consent. Upon any such assignment, the Lender shall have no further liability or obligation hereunder.

16.   Except as prohibited by statute, the Borrower shall, and hereby does, waive trial by jury in any action, proceeding or counterclaim brought by the Lender on any matter whatsoever arising out of or in any way connected with this Agreement, the Collateral and/or the relationship created thereby; and, with respect to any matter for which a jury trial cannot be waived, the Borrower agrees not to assert any such claim as a counterclaim in, or move to consolidate same with, any action or proceeding.

17.   Any notice, demand or consent under this Agreement shall be in writing. Any notice or demand under this Agreement shall be deemed to have been sufficiently given for all purposes hereof   (a) if and when delivered personally or (b) if or when mailed by registered or certified mail, postage prepaid, return receipt requested, to the party at its address shown above and in the case of notice to the Lender, with a copy to Medallion Funding LLC, 437 Madison Avenue, 38th Floor, New York, New York  10022.

Any party hereto may designate a different address for the purpose of the service of notices hereunder by giving notice thereof in accordance with the provisions of this Paragraph.

18. This Agreement shall inure to the benefit of and be binding upon, the Lender named herein, its successors, assigns and legal representatives. Without intending to permit an assignment by the Borrower, this Agreement shall also bind the Borrower named herein, its successors, assigns and legal representatives.

19. Except for those terms expressly defined herein, all other terms herein that are defined in the Uniform Commercial Code shall have the meanings therein stated.

20. All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require. The term "Borrower" shall mean "Borrowers" if more than one person is the Borrower, and in such event, the obligations of the Borrower shall be joint and several.

21. This Agreement and the rights and obligations of the Lender and the Borrower hereunder shall be construed in accordance with and governed by the laws of the State of Illinois. This Agreement contains the full understanding of the parties with respect to the subject matter hereof. This Agreement may not be terminated nor may any of its provisions be changed or waived, except by writing signed by the party against whom such termination, change or waiver is sought to be applied. A waiver by the Lender of any default, right or remedy hereunder on any one occasion shall not be construed as a waiver of any other default or a bar to any right or remedy the Lender would otherwise have on any future occasion.

22. In case any one or more of the provisions contained in this Agreement or any application thereof shall be deemed invalid, illegal or unenforceable in any respect, such affected provisions shall be construed and deemed rewritten so as to be enforceable to the maximum extent permitted by law, thereby implementing to the maximum extent possible, the intent of the parties hereto, and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

23. If any amounts due under this Agreement or the Note are due upon demand or notice by the Lender and if the Lender does not demand or notice the same or if noticed, the period under the notice extends beyond the Maturity Date, then such amounts shall in any event be due and payable upon the Maturity Date.

24. The Borrower agrees (a) to furnish to the Lender, with reasonable promptness, such financial and other information concerning the business, operations, assets and condition of the Borrower, financial or otherwise, as the Lender may reasonably request from time to time, and (b) at any reasonable time and from time to time permit the Lender or any of its agents or representatives to examine and make copies of and abstracts from its books and records (including, without limitation, documents and records required to be kept by the Borrower according to the Rules of the City of Chicago Taxi and Department of Consumer Services), visit its places of business and garages in which its taxicab vehicles are maintained, and discuss its affairs, finances and accounts with the Borrower or any of its officers, directors, members, or partners, or its independent accountants, whom the Borrower shall direct to cooperate fully in any such discussions. Further, at the request of the Lender made no less than two months after the end of the Borrower's fiscal year, the Borrower shall, within ten (10) days of such request, provide to Lender its annual balance sheet and certified financial statement for such fiscal year, certified by an independent certified public accountant.

25. The Borrower shall, at any time and from time to time upon five (5) days' notice from the Lender, deliver to the Lender or its designees estoppel certificates as to the Collateral, certified by an officer or general partner of the Borrower, as the case may be, setting forth as of the date of such certificate the amounts paid and unpaid amounts due to the Lender upon the Indebtedness, whether any default or Event of Default has occurred with respect to such Collateral or this Agreement or any event has occurred or condition exists which, with the passage of time or the giving of notice, or both, would constitute a default or Event of Default under this Agreement (and if so, specifying the nature thereof).

26. In the event that any payment due hereunder or under the Note and upon any other part of the Indebtedness is not received by the Lender within five (5) days of the date when such payment is due and payable, a late charge of five cents ($0.05) for each dollar ($1.00) so overdue may be charged by the Lender for the purpose of defraying the expense incident to handling such delinquent payment, which late charge shall be payable on demand.

27. From and after the date of occurrence of an Event of Default or the Maturity Date, or, if any other sum is not paid when it is due hereunder, from and after the date when it is due, interest on the entire unpaid balance of the Indebtedness, and on any other sums payable hereunder to the Lender, shall accrue and be payable at the highest interest rate permitted by law.

28. Borrower hereby authorizes Lender, Lender's agents and assigns to file and perfect UCC liens and to amend, modify and continue said liens as Lender deems necessary.

24

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

BORROWER:  Shere Corp.

By: _____
   **Mebrahtu T. Tsehay - President and Secretary**

LENDER: Medallion Financial Corp.

By: _____

## SCHEDULE A

**City of Chicago**
**Taxicab License**
**Medallion Number**

**4307TX**

All Stock of **Shere Corp.**

And such collateral as described in the UCC-1 Form executed herewith.

(Please note, this collateral may include collateral from one or more additional loans with this lender or its affiliates.)

_[signature]_
**Mebrahtu T. Tsehay**

## SCHEDULE B

### Permitted Encumbrances

### None

Medallion #

THERE ARE NO OTHER PERMITTED ENCUMBRANCES OTHER THAN THOSE SET FORTH ABOVE.

STATE OF ILLINOIS)
        : ss.:
COUNTY OF COOK )

      On the **24th** day of **July, 2013**, before me personally came **Mebrahtu T. Tsehay**, to me known, who, being by me duly sworn, did depose and say that he/she resides at **15 N. Delphia Avenue, Park Ridge, IL 60683**; that he/she is the President of **Shere Corp.,** the corporation described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by order of the board of directors of said corporation.

_____
Notary Public

OFFICIAL SEAL
RITA RIVERA
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 08/28/2015

# EXHIBIT 6

## GUARANTY
Medallion # **4307TX**

In consideration of financial accommodations given or to be given or continued to **Shere Corp.** (the "Borrower"), by **Medallion Financial Corp.** (the "Lender"), the undersigned as primary obligor and not merely as a surety irrevocably and unconditionally guarantees to the Lender payment when due, whether by acceleration or otherwise, of any and all liabilities of the Borrower to the Lender, together with all interest thereon and all attorneys' fees, costs and expenses of collection incurred by the Lender in enforcing any of such liabilities.

The term "liabilities of the Borrower" shall include duties, debts, liabilities and obligations of the Borrower (or its successors, assigns or legal representatives) to the Lender, present or future, whether now or hereafter existing, contingent or absolute, howsoever arising or incurred or evidenced, including, without limitation, the duties, debts, liabilities and obligations of the Borrower under a certain Security Agreement dated **July 24, 2013** between the Borrower and the Lender and under a certain Promissory Note of even date herewith given by the Borrower to the Lender and evidencing a debt in the sum of **$240,000.00**.

The undersigned waives notice of acceptance of this guaranty and notice of any liability to which it may apply, and waives presentment, demand of payment, protest, notice of dishonor or nonpayment of any such liabilities, suit or taking other action by the Lender against, and any other notice to, any party liable thereon (including the undersigned).

The Lender may at any time and from time to time (whether or not after revocation or termination of this guaranty) without the consent of or (except as shall be required by applicable statute and cannot be waived) notice to the undersigned, without incurring responsibility to the undersigned, without impairing or releasing the obligations of the undersigned hereunder, upon or without any terms or conditions and in whole or in part:

(1)  change the manner, place or terms of payment, and/or change or extend the time of payment of, renew or alter, any liability of the Borrower, any security therefor, or any liability incurred directly or indirectly in respect thereof, and the guaranty herein made shall apply to the liabilities of the  Borrower as so changed, extended, renewed or altered;

(2)  sell, exchange, release, surrender, realize upon or otherwise deal with any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the liabilities hereby guaranteed or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(3)  exercise or refrain from exercising any rights against the Borrower or others (including the undersigned) or otherwise act or refrain from acting;

(4)  settle or compromise any liability hereby guaranteed, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to creditors of the Borrower other than the Lender and the undersigned; and

(5)  apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Lender regardless of what liability or liabilities of the Borrower remain unpaid.

No invalidity, irregularity or unenforceability of all or any part of the liabilities hereby guaranteed or of any security therefor or any other circumstance that might otherwise constitute a legal or equitable defense of a guarantor shall affect, impair or be a defense to this guaranty, and this guaranty is a primary obligation of the undersigned.

This guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon.  As to each of the undersigned, this guaranty shall continue until written notice of revocation signed by such undersigned, or until written notice of the death of such undersigned shall in each case have been actually received by the Lender, notwithstanding a revocation by, or the death of, or complete or partial release for any cause of, any one or more of the remainder of the undersigned, or of the Borrower or of anyone liable in any manner for the liabilities hereby guaranteed or of the liabilities (including those hereunder) incurred directly or indirectly in respect thereof or hereof, and notwithstanding the dissolution, termination or increase or change in personnel of any one or more of the undersigned which may be a partnership.  No revocation or termination hereof shall affect in any manner rights arising under this guaranty with respect to (a) liabilities that shall have been created, contracted, assumed or incurred prior to receipt by the Lender of written notice of such revocation or termination or (b) liabilities which shall have been created, contracted, assumed or incurred after receipt of such written notice pursuant to any contract entered into by the Lender prior to receipt of such notice; and the sole effect of revocation or termination hereof shall be to exclude from this guaranty liabilities thereafter arising that are unconnected with liabilities therefore arising or transactions theretofore entered into.

All notices provided to be given to the Lender herein shall be sent by registered, certified mail, or federal express, return receipt requested.

Any and all rights and claims of the undersigned against the Borrower or any of its property, arising by reason of any payment by the undersigned to the Lender pursuant to the provisions of this guaranty, shall be subordinate and subject in right of payment to the prior payment in full of all liabilities of the Borrower to the Lender.

The happening of any of the following events shall constitute an "Event of Default" under this guaranty:

(a)  any default with respect to payment or performance of the liabilities of the Borrower;

(b) any failure to perform and/or breach by the undersigned of any of the terms, covenants and conditions of this guaranty or the Pledge Agreement between the undersigned and the Lender of even date herewith or any other document or instrument delivered in connection herewith and securing the performance hereof by any of the undersigned;

(c) the death or insolvency (however evidenced) of the Borrower or any person (including the undersigned) who is liable directly or indirectly in respect of any of the liabilities of the Borrower;

(d)  any change in the financial condition of the Borrower or any aforesaid person that the Lender, in its sole discretion, deems to be adverse;

(e)  the suspension of business of the Borrower or any aforesaid person;

(f)  the issuance of any warrant, process or order of attachment, garnishment or other lien and/or the filing of a lien as a result thereof against any of the property of the Borrower or any aforesaid person;

(g)  the Borrower or any aforesaid person makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for the Borrower or any aforesaid person or for any property of any of them, or any proceeding is commenced by or against the Borrower or any aforesaid person under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, receivership,

4

liquidation or dissolution law or statute;

(h) it appears that any representation in any financial or other statement of the Borrower or any aforesaid person, delivered to the Lender by or on behalf of the Borrower or such person, is untrue or incomplete.

Upon the occurrence of an Event of Default, and at any time thereafter, the Lender may, without notice to the Borrower or any aforesaid person, make the liabilities of the Borrower to the Lender, whether or not then due, immediately due from and payable hereunder by the undersigned, and the Lender shall be entitled to enforce the obligations of the undersigned hereunder.

If claim is ever made upon the Lender for repayment or recovery of any amount or amounts received by the Lender in payment or on account of any of the liabilities of the Borrower and the Lender repays all or part of said amount of (a) any judgment, decree or order of any court or administrative body having jurisdiction over the Lender or any of its property, or (b) any settlement or compromise of any such claim effected by the Lender with any such claimant (including the Borrower), then and in such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any liability of the Borrower, and the undersigned shall be and remain liable to the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Lender.

Any acknowledgment or new promise, whether by payment of principal or interest or otherwise and whether by the Borrower or others (including the undersigned), with respect to any of the liabilities of the Borrower shall, if the statute of limitations in favor of the undersigned against the Lender shall have commenced to run, toll the running of such statute of limitations and, if the period of such statute of limitations shall have expired, prevent the operation of such statute of limitations.

The undersigned shall pay to the Lender all costs and expenses, including filing fees and attorneys' fees, incurred by the Lender in connection with the custody, care, preservation or collection of any of the property of the undersigned or in seeking to enforce any of the liabilities or obligations of the undersigned hereunder.

The Lender shall have the right, at any time and from time to time, without notice, to sell, assign, transfer or otherwise dispose of all or any part of its rights under this guaranty. In such event, each and every immediate and successive purchaser, assignee, transferee or holder of all or any part of such rights shall have the right to enforce this guaranty, by legal action or otherwise, for its own benefit as fully as if such purchaser, assignee, transferee or holder were by name specifically given such right. The Lender shall have an unimpaired right to enforce this guaranty for its benefit to that portion of the rights hereunder that were not sold, assigned, transferred or otherwise disposed of.

No delay on the part of the Lender in exercising any of its options, powers or rights, or partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modification or amendment of this guaranty, shall be deemed to be made by the Lender unless the same shall be in writing, duly signed on behalf of the Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of the Lender or the obligations of the undersigned to the Lender in any other respect at any other time.

The undersigned waives the right of trial by jury in the event of any litigation between the parties hereto in respect of any matter arising under this guaranty and agrees that, should the Lender bring any judicial proceedings in relation to any such matter, the undersigned will not interpose any counterclaim or setoff of any nature.

This guaranty and the rights and obligations of the Lender and of the undersigned hereunder shall be deemed to be a contract made under and shall be governed and construed in accordance with the laws of the State of Illinois, and this guaranty is binding upon the undersigned, his, their, or its executors, administrators, successors or assigns, and shall inure to the benefit of the Lender, its successors or assigns. In the event that the Lender brings any action or suit in any court of record of the State of Illinois or of the United States to enforce any or all liabilities of the undersigned hereunder, service of process may be made upon the undersigned by mailing a copy of the summons to the undersigned at the address below set forth.

In case one or more of the provisions contained in this guaranty shall be or shall be deemed to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

The rights, remedies, powers and privileges of the Lender hereunder are cumulative and not conclusive of any other rights, remedies, powers or privileges now or hereafter existing at law or in equity.

This guaranty may be signed in any number of counterparts with the same effect as if the signatures thereto and hereof were upon the same instrument.

The undersigned, if more than one, shall be jointly and severally liable hereunder and the term "undersigned" wherever used herein shall mean the undersigned or any one or more of them. Anyone signing this guaranty shall be bound hereby, whether or not anyone else signs this guaranty at any time. The term "Lender" includes any agent of the Lender acting for it.

This Agreement is secured by a Pledge Agreement dated of even date herewith between the undersigned and the Lender.

Dated: <u>July 24, 2013</u>

_____          _____
                                          **Mebrahtu T. Tsehay** - Individual Guarantor

                                          Address: **15 N. Delphia Avenue, Park Ridge, IL
                                          60683**

                                          S.S # / Tax I.D.: ████████

                                          Tax I.D.: ████████

STATE OF ILLINOIS)
: ss.:
COUNTY OF COOK )


On the **24th** day of **July, 2013**, before me personally came **Mebrahtu T. Tsehay, President and Secretary**, Individual Guarantor, to me known to be the individual(s) described in and which executed the foregoing instrument; and that he/she acknowledged that he/she executed the same.

_____
Notary Public

```
OFFICIAL SEAL
RITA RIVERA
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 08/28/2015
```

# EXHIBIT 7

07/26/2013  22:34      7738565175              ...INGS INC                          PAGE  01/01



**CITY OF CHICAGO**  **2013**

TAHOORA

TRANSPORTATION INC

MAR 26 2013

# 1226TX

Department of Business Affairs and
Consumer Protection

PRESIDENT/OWNER:
Mebrahtu T. Tsehay

2009 / MERCURY / GRAND MARQUIS
SEDAN - ████████116
BLUE/WHITE
TAXI TRONIC ██94
FIRST CHICAGO INS CO
███████-1226 exp  01/01/2014

SUN TAXI
Exempt

# EXHIBIT 8



PRESIDENT/OWNER:
Mebrahtu T. Tsehay

CENTURY SURETY/HYBRID UND.
2012 / TOYOTA / CAMRY
HYBRID - ████████925
BLUE/WHITE
TAXI TRONIC ███69
FIRST CHICAGO INS CO
████████4307TX exp   01/01/2014
SUN TAXI
Security Camera
          /                    /

# EXHIBIT 9

Model Plan
11/22/2013

Trustee:  ☑ Marshall    ☐ Meyer
          ☐ Stearns     ☐ Vaughn

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS

**In re:**                                )    **Case No. 17-32653**
                                          )
**Mebrahtu Tsehay**                       )
                                          )
**Debtors.**                              )    **Modified Chapter 13 Plan, dated February 6, 2018**

☑   **A check in this box indicates that the plan contains special provisions, set out in Section G. Otherwise, the plan includes no provisions deviating from the model plan adopted by the court at the time of the filing of this case.**

**Section A.**
**Budget items**

1. As stated in the debtor's Schedule I and J, (a) the number of persons in the debtor's household is **6**; (b) their ages are **2 Adults & 4 Minor Children**; (c) total household monthly income is $ **4,066.67**; and (d) total monthly household expenses are $ **3,488.00**, leaving $ **578.67** available monthly for plan payments.

2. The debtor's Schedule J includes $ **N/A** for charitable contributions; the debtor represents that the debtor made substantially similar contributions for **N/A** months prior to filing this case.

**Section B.**
**General items**

1. The debtor assumes all unexpired leases and executory contracts listed in Section G of this plan; all other unexpired leases and executory contracts are rejected. Both assumption and rejection are effective as of the date of plan confirmation.

2. Claims secured by a mortgage on real property of the debtor, set out in Section C or in Paragraph 2 of Section E of this plan, shall be treated as follows:

(a) *Prepetition defaults.* If the debtor pays the cure amount specified in Paragraph 5 of Section E, while timely making all required postpetition payments, the mortgage will be reinstated according to its original terms, extinguishing any right of the mortgagee to recover any amount alleged to have arisen prior to the filing of the petition.

(b) *Costs of collection.* Costs of collection, including attorneys' fees, incurred by the holder after the filing of this bankruptcy case and before the final payment of the cure amount specified in Paragraph 5 of Section E may be added to that cure amount pursuant to order of the court on motion of the holder.

3. The holder of any claim secured by a lien on property of the estate, other than a mortgage treated in Section C or in Paragraph 2 of Section E, shall retain the lien until the earlier of (a) payment of the underlying debt determined under nonbankruptcy law, or (b) discharge under 11 U.S.C. § 1328, at which time the lien shall terminate and be released by the creditor.

4. The debtor shall retain records, including all receipts, of all charitable donations listed in Schedule J.

**1**

| | |
|---|---|
| **Section C.**<br>***Direct***<br>***payment of***<br>***claims by***<br>***debtor*** | ☑ The debtor will make no direct payments to creditors holding prepetition claims. */or/*<br>☐ The debtor will make current monthly payments, as listed in the debtor's Schedule J--increased or decreased as necessary to reflect changes in variable interest rates, escrow requirements, collection costs, or similar matters--directly to the following creditors holding claims secured by a mortgage on the debtor's real property:<br>        Creditor:  -NONE-_____ , monthly payment, $ _____ |
| **Section D.**<br>***Payments***<br>***by debtor***<br>***to the***<br>***trustee;***<br>***plan term***<br>***and***<br>***completion*** | 1. *Initial plan term*. The debtor will pay to the trustee $ **435.00** monthly for **12** months [and $ ____ **monthly for an additional** ____ **months**], for total payments, during the initial plan term, of $ **5,220.00** . [Enter this amount on Line 1 of Section H.]<br><br>2. *Adjustments to initial term*. If the amount paid by the debtor to the trustee during the initial plan term does not permit payment of general unsecured claims as specified in Paragraphs 8 and 9 of Section E, then the debtor shall make additional monthly payments, during the maximum plan term allowed by law, sufficient to permit the specified payments.<br><br>3. *Plan completion.* ☑ The plan will conclude before the end of the initial term, as adjusted by Paragraph 2, only at such time as all allowed claims are paid in full, with any interest required by the plan /or/<br>☐ The plan will conclude before the end of the initial term at any time that the debtor pays to the trustee the full amounts specified in Paragraphs 1 and 2. |
| **Section E.**<br>***Disburse-***<br>***ments by***<br>***the trustee*** | The trustee shall disburse payments received from the debtor under this plan as follows:<br><br>1. *Trustee's fees*. Payable monthly, as authorized; estimated at **5.00**% of plan payments; and during the initial plan term, totaling $ **261.00** . [Enter this amount on Line 2a of Section H.]<br><br>2. *Current mortgage payments*. Payable according to the terms of the mortgage, as set forth below, beginning with the first payment due after the filing of the case. Each of these payments shall be increased or decreased by the trustee as necessary to reflect changes in variable interest rates, escrow requirements, or similar matters; the trustee shall make the change in payments as soon as practicable after receipt of a notice of the change issued by the mortgage holder, but no later than 14 days after such receipt.  The trustee shall notify the debtor of any such change at least 7 days before putting the change into effect. Any current mortgage payment made by the debtor directly to the mortgagee shall be deducted from the amounts due to be paid to the trustee under this plan.<br><br>-NONE-<br><br>The total of all current mortgage payments to be made by the trustee under the plan is estimated to be $ **0.00** . [Enter this amount on Line 2b of Section H.]<br><br>3.1. *Other secured claims secured by value in collateral*. All secured claims, other than mortgage claims treated above and claims treated in Paragraph 3.2, are to be paid in full during the plan term, with interest at an annual percentage rates and in the fixed monthly amounts specified below regardless of contrary proofs of claim (subject to reduction with the consent of the creditor):<br><br>-NONE- |

**2**

[All claims in the debtor's Schedule D, other than mortgages treated above and claims for which the collateral has no value, must be listed in this paragraph.]

The total of all payments on these secured claims, including interest, is estimated to be $ __0.00__ . [Enter this amount on Line 2c of Section H.]

3.2 *Other secured claims treated as unsecured.* The following claims are secured by collateral that either has no value or that is fully encumbered by liens with higher priority. No payment will be made on these claims on account of their secured status, but to the extent the claims are allowed, they will be paid as unsecured claims, pursuant to Paragraphs 6 and 8 of this section.
-NONE-

4. *Priority claims of debtor's attorney.* Payable in amounts allowed by court order. The total claim of debtor's attorney is estimated to be $ __2,343.00__ . [Enter this amount on Line 2d of Section H.]

5. *Mortgage arrears.* Payable as set forth below, regardless of contrary proofs of claim, except that the arrears payable may be reduced either with the consent of the mortgagee or by court order, entered on motion of the debtor with notice to the trustee and the mortgagee. Any such reduction shall be effective 14 days after either the trustee's receipt of a notice of reduction consented to by the mortgagee or the entry of a court order reducing the arrearage.
-NONE-

6. *Allowed priority claims other than those of the debtor's attorney.* Payable in full, without interest, on a pro rata basis. The total of all payments on non-attorney priority claims to be made by the trustee under the plan is estimated to be $ __0.00__ . [Enter this amount on Line 2f of Section H.] Any claim for which the proof of claim asserts both secured and priority status, but which is not identified as secured in Paragraphs 2, 3.1, or 3.2 of this section, will be treated under this paragraph to the extent that the claim is allowed as priority claim.

7. *Specially classified unsecured claim.* A special class consisting of the following non-priority unsecured claim: __-NONE-__ shall be paid at __N/A__ % of the allowed amount. The total of all payments to this special class is estimated to be $ __N/A__ . [Enter this amount on Line 2g of Section H.]

Reason for the special class: __N/A__ .

8. *General unsecured claims (GUCs).* All allowed nonpriority unsecured claims, not specially classified, including unsecured deficiency claims under 11 U.S.C. § 506(a), shall be paid, pro rata, ☑ in full, /or/ ☐ to the extent possible from the payments set out in Section D, but not less than __N/A__ % of their allowed amount. [Enter minimum payment percentage on Line 4b of Section H.] Any claim for which the proof of claim asserts secured status, but which is not identified as secured in section C, or Paragraphs 2, 3.1, 3.2 or 5 of this section, will be treated under this paragraph to the extent that the claim is allowed without priority.

9. *Interest.* ☐ Interest shall not be paid on unsecured claims /or/ ☑ interest shall be paid on unsecured claims, including priority and specially classified claims, at an annual percentage rate of __4__ % [Complete Line 4d of Section H to reflect interest payable.]

**3**

**Section F.**
*Priority*

The trustee shall pay the amounts specified in Section E of this Plan in the following order of priority, with claims in a given level of priority reduced proportionately in the event of insufficient plan payments: (1) trustee's fee; (2) current mortgage payments; (3) secured claims listed in Section E, Paragraph 3.1; (4) priority claims of the debtor's attorney; (5) mortgage arrears; (6) priority claims other than those of the debtor's attorney; (7) specially classified non-priority unsecured claims; and (8) general unsecured claims.

**Section G.**
*Special terms*

Notwithstanding anything to the contrary set forth above, this Plan shall include the provisions set forth in the box following the signatures. The provisions will not be effective unless there is a check in the notice box preceding Section A.

**Section H.**
*Summary of payments to and from the trustee*

(1) Total payments from the debtor to the Chapter 13 trustee
(subject to Paragraph 2 of Section D)                                                        $        5,220.00

(2) Estimated disbursements by the trustee for non-GUCs
(general unsecured claims):
  (a) Trustee's fees                                                        $            261.00
  (b) Current mortgage payments                                    $                0.00
  (c) Payments of other allowed secured claims          $                0.00
  (d) Priority payments to debtor's attorney                 $          2,343.00
  (e) Payments of mortgage arrears                              $                0.00
  (f) Payments of non-attorney priority claims           $                0.00
  (g) Payments of specially classified unsecured claims  $            0.00
  (h) Total *[add Lines 2a through 2g]*                                              $        2,604.00

(3) Estimated payments available for GUCs and interest
  during initial plan term *[subtract Line 2h from Line 1]*               $        2,616.00

(4) Estimated payments required after initial plan term:
  (a) Estimated total GUCs, including unsecured deficiency
    claims under § 506(a)                                        $          2,471.00
  (b) Minimum GUC payment percentage                                     100  %
  (c) Estimated minimum GUC payment *[multiply line 4a by
    line 4b]*                                                            $          2,471.00
  (d) Estimated interest payments on unsecured claims    $              76.00
  (e) Total of GUC and interest payments *[add Lines 4c
    and 4d]*                                                            $          2,547.00
  (f) Payments available during initial term *[enter Line 3]*  $       2,616.00
  (g) Additional payments required *[subtract Line 4f from
    Line 4e]*                                                                          $          -69.00

(5) Additional payments available:
  (a) Debtor's monthly payment less trustee's fees and
    current mortgage payments made by the trustee     $              N/A
  (b) Months in maximum plan term after initial term                    N/A
  (c) Payments available *[multiply line 5a by line 5b]*                      $              N/A

**4**

Best Case Bankruptcy

**Section I.**
*Payroll*
*Control*

☐ A check in this box indicates that the debtor consents to immediate entry of an order directing the debtor's employer to deduct from the debtor's wages the amount specified in Paragraph 1 of Section D and to pay that amount to the trustee on the debtor's behalf. If this is a joint case, details of the deductions from each spouse's wages are set out in Section G.

**Signatures** **Debtor(s) [Sign only if not represented by an attorney]**

_____    _____    **Date** _____

**Debtor's Attorney**    /s/Jonathan R. Haddad _____    **Date** **February  6, 2018**

*Attorney Information*
*(name, address,*
*telephone, etc.)*

Jonathan R. Haddad 6319215
The Law Offices of Jonathan R Haddad
1147 W 175th Street
Homewood, IL 60430
(708)259-3337
Fax: (708)991-2058

**Special Terms** *[as provided in Paragraph G]*

1. Debtor is surrendering Taxi Medallion #1226 and Taxi Medallion #4307 to Medallion Financial Corp/Medallion Bank  in full satisfaction of its secured claims.

2. Debtor will make direct payments to Cook County Treasurers Office for the real property located at 15 N Delphia Ave Park Ridge, IL.

5